JOSIE HELM v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

**Division One, December 22, 1904.**

**NEGLIGENCE: Section Hand: Place of Safety: Rate of Speed.** The deceased, a section hand, left his place of work on the track in a city, and went up the track to a water keg six feet from the track and drank of the water, and then his feet becoming entangled with some picks, shovels and other tools which had been left on the ground between the track and the water keg, he "pitched sideways" towards the track and fell "right over in front" of a passing train and was killed. The track was level and straight for 600 feet, and the train was from 200 to 600 feet distant when his feet began to "tangle up," and he was looking in its direction, and when he began to "pitch sideways" the train was not over twenty or thirty feet distant. *Held,* first, that in respect to the duty which the railroad company owed its section hands engaged in the repair of its tracks, "the surroundings and circumstances" were not such as to make a rate of speed of eighteen or twenty miles an hour negligence within itself; second, the speed of the train, whether running eighteen or six or eight miles an hour, was wholly immaterial, since the evidence shows that deceased was not in a perilous condition until he began to "pitch sideways," and that, even were the train running at a very slow rate, it could not have been stopped between the time deceased began to "pitch sideways" and the time he fell upon the track.

Appeal from Jackson Circuit Court.—*Hon. Jno. W. Henry,* Judge.

REVERSED.

*Elijah Robinson* for appellant.

(1) Plaintiff's own evidence shows that she was not entitled to recover and therefore the court should have sustained defendant's demurrer to the evidence. Russell v. Barcroft, 1 Mo. 662; Lee v. David, 11 Mo. 114; Bolen v. Railroad, 36 Mo. 484; Alexander v. Har-

rison, 38 Mo. 258; McFarland v. Bellows, 49 Mo. 311; Charles v. Patch, 87 Mo. 450; Hunt v. Railroad, 89 Mo. 607; Hyde v. Railroad, 110 Mo. 272; Havens v. Railroad, 155 Mo. 216; Sharp v. Railroad, 161 Mo. 214; Roberts v. Tel. Co., 166 Mo. 384. There must be substantial evidence in support of plaintiff's case; otherwise the court should direct a verdict for the defendants. The doctrine that the case must be submitted to the jury where there is a scintilla of evidence is no longer, if it ever was, the law of this State. Courts will not stultify themselves by giving credence to evidence which is in conflict with conceded physical facts, against reason, and contrary to common observation and experience. State v. Anderson, 89 Mo. 332; State v. Bryant, 102 Mo. 24; State v. Turlington, 102 Mo. 642; State v. Nelson, 118 Mo. 124; State v. Brown, 119 Mo. 527; Hayden v. Railroad, 124 Mo. 566; Kelsey v. Railroad, 129 Mo. 362; Lane v. Railroad, 132 Mo. 4; Payne v. Railroad, 136 Mo. 583; 4 Elliott's Railroad Law, sec. 1703. (2) Defendant is not liable for the consequence of an accident which was not caused by it and which its engineer could not foresee or anticipate. The evidence in this case shows clearly and conclusively that the death of plaintiff's husband resulted from an accident, which occurred without fault upon the part of the defendant, and which defendant's engineer could not have foreseen or anticipated; and therefore the court should have sustained defendant's demurrer to the evidence. Beasley v. Transfer Co., 148 Mo. 421; 21 Am. and Eng. Ency. of Law, 497. (3) The engineer had a right to assume that the deceased would not get into a position of danger. Moody v. Railroad, 68 Mo. 470; Maloy v. Railroad, 84 Mo. 270; Boyd v. Railroad, 105 Mo. 371; Feidler v. Railroad, 107 Mo. 652; Hyde v. Railroad, 110 Mo. 278; Reardon v. Railroad, 114 Mo. 384; St. Clair v. Railroad, 133 Mo. 240; Kreis v. Railroad, 148 Mo. 333; Sharp v. Railroad, 161 Mo. 214; Railroad v. Black, 98 Ala. 313; Frazier v. Rail-

road, 81 Ala. 185; Meredith v. Railroad, 108 N. Car. 616; Johnson v. Railroad, 13 Am. and Eng. R. R. Cases, 626, and note; Railroad v. Graham, 95 Ind. 286; Palmer v. Railroad, 112 Ind. 254; Railroad v. Pitzer, 109 Ind. 196; Railroad v. Miller, 25 Mich. 279.

*Frank P. Walsh, Porterfield, Sawyer & Conrad* and *R. J. Ingraham* for respondent.

The evidence of respondent tended to show that deceased got his feet entangled in the tools, and was in a position of peril when the train came around the curve six hundred feet away; that he struggled from that time until the train struck him; that he was close enough to the track to be in danger; that he did not get out of that position from the time the engine came into view, about six hundred feet away, up to the time it struck him and knocked him across a forty-five foot street; that there was ample time and space within which to stop the train before it reached and struck him; that the track was straight, and, therefore, the train men could have seen his peril. Disinterested witnesses did see his peril, while the train traversed from three hundred to six hundred feet. This evidence, together with all reasonable inferences, must be accepted as an absolute verity in passing upon the demurrer. Gratiot v. Railroad, 116 Mo. 466; Kelly v. Railroad, 95 Mo. 281. It was therefore right to submit the case to the jury. The fact that appellant's witnesses testified to the contrary did not deprive respondent of the right to have this question of fact submitted to the jury; and the court did right in submitting it to the jury. Sullivan v. Railroad, 117 Mo. 214; Chitty v. Railroad, 166 Mo. 441; Klockenbrink v. Railroad, 172 Mo. 678; Carter v. Railroad, 156 Mo. 642; Tempo v. Railroad, 83 Mo. App. 69; Kellny v. Railroad, 101 Mo. 67; Kelley v. Railroad, 95 Mo. 279; Guenther v. Railroad, 95 Mo. 286. Unlike most cases presented to this

court, there is no question of contributory negligence in this case—excepting the assertion of it in appellant's answer. It is not a case of an adult section man standing, in full possession of his faculties, upon a railroad track. But, on the contrary, it is the case of a man who, by misfortune, is not in possession of his power of free locomotion, and is in a position of danger while the train traverses a long distance.

MARSHALL, J.—This is an action, under the statute, for five thousand dollars damages, caused by the killing of the plaintiff's husband, by a regular passenger train, at a point in Kansas City, where the defendant's tracks cross Lydia avenue, about nine o'clock, a. m., on August 26, 1899. The plaintiff recovered a judgment for five thousand dollars, and the defendant appealed.

The petition charges three acts of negligence on the part of the defendant, to-wit: first, a violation of the railroad speed ordinance of the city, which made a greater rate of speed than six miles an hour a misdemeanor, punishable by a fine; and the acceptance thereof by the defendant in consideration of a grant by the city of a right to construct a switch track on Front street; second, common law negligence in running the train, in a populous part of the city, "at a rate of speed which, under the surroundings and circumstances, was negligent and dangerous;" and, third, so negligently, carelessly and unskillfully running the train as to run over the deceased after it knew or by the exercise of ordinary care could have known of the peril to which he was exposed, and in not stopping the train after it knew or could have so known of such peril in time to have avoided the injury.

There was no such speed ordinance or acceptance thereof attempted to be shown, nor was the case tried upon the theory of the plaintiff's right to recover on

account of a violation thereof. So that nothing further need be said as to the first averment of negligence.

The answer admits that plaintiff was the wife of the deceased, and admits the killing, but denies that the defendant was guilty of any negligence, alleges contributory negligence on the part of the deceased, and concludes with a general denial of all allegations of the petition that are not admitted to be true.

The facts developed upon the trial are these:

The railroad runs east and west and Lydia avenue runs north and south. For a distance of six hundred feet west of Lydia avenue the track is straight and level and there is nothing to obstruct the view. The deceased was a section hand in the employ of the defendant, was forty-three years of age, and possessed of all his faculties and had been working as a section hand for about four months. About seven o'clock of the morning of the accident, the deceased went to the place of the accident, on a hand car, with the section gang, to repair the track. They unloaded their picks and shovels and tools and a water keg from the hand car onto the ground south of the track and just west of Lydia avenue. There was a telegraph pole about six feet south of the track, and they placed the water keg just west of the telegraph pole, and left some picks, shovels and tools lying on the ground between the telegraph pole and the track. They then went to work repairing the track just east of Lydia avenue. The eastbound passenger train was due to pass that point about nine o'clock. About that time the deceased left the place at which he was working and went across Lydia avenue and to the water keg to get a drink of water. In so doing his face was turned towards the west in the direction from which the train was to come. He reached the water keg, got a drink of water, put the top on the keg and placed the cup on the top of the lid. The train was composed of an engine, a mail car, a baggage car and two coaches, and was equipped with

air-brakes. These facts are conceded to be true by both parties. What happened after this is the subject of controversy.

The plaintiff called three witnesses who saw the accident, to-wit, James W. Havens, Mack McConnell and Vaughan. The first, Havens, was one hundred and fifty feet east of the place of the accident. The second, McConnell, was on top of a hill, south and east of Lydia avenue, and was two hundred and fifty feet distant from the place of the accident. The third, Vaughan, was standing at a window of the Gille Hardware Company, at First and Lydia avenues, which was from two hundred and fifty to three hundred feet from the place of accident. They all say that after the deceased had taken a drink of water he staggered or stumbled and his feet seemed to get "tangled" up with the tools and he was trying to move and could not.

Havens says that when the deceased got so "tangled up" with the tools, the train was from two hundred to six hundred feet from him (he stated both distances at different times in the course of his examination). Later, on being recalled for further cross-examination, this witness identified a written statement he had made just after the accident in which he testified as follows:

"All I know about it is that I used to work at that furniture factory at First and Lydia, and had been laid off for want of material to work with, and had been down to Sheffield, Missouri, and was returning up the track, and the train was coming out, and I seen it strike the man. I was about 150 or 200 feet east of Lydia avenue where I saw the man struck. He was west of the crossing when he was struck.

"Q. Where was this man when you first saw him? A. He was just straightening up from the water keg that was there, and seemed as though he got his feet tangled up in some of the shovels that were laying there; then he went to turn around from the keg, he

got his feet tangled up in those shovels, and as he went to turn around the train was right there and he fell right over in front of the train and was struck and carried across on the other side of the crossing.

"Q. Did he throw up his hands when he went to fall? A. Not that I noticed; he pitched forward toward the train.

"Q. When you first saw him there at the water keg was he facing the train? A. Yes, sir."

McConnell says the train was three hundred feet from the deceased when he became so tangled with the tools. And Vaughan placed the distance at two hundred and fifty feet. They all say that deceased was then five or six feet south of the track, was struggling to free his feet and could not, and that as the pilot of the engine came opposite to him he "pitched" or fell sideways against it, and was carried on the pilot about fifty feet and thrown off, and was injured so that he died.

The defendant called four eyewitnesses to the accident, to-wit, Patrick Conner, the engineer, Frank Farrell, the fireman of the engine, Patrick Naughton, the flagman at the Lydia avenue crossing, and Morris Sullivan, a section hand who was working on the repair of the track with the deceased. Conner testified that he was on the right-hand side of his engine, and saw the deceased when he was about three hundred feet from him; that he was then in the act of taking a drink of water from the keg, and was facing the train; that he was then about six or seven feet from the track; that when the train got within ten or fifteen feet of him, he began to stagger back towards the train; that he immediately began to blow the whistle and to set the air-brakes and did all he could to stop the train, but that he fell against the pilot on the front of the engine and was killed; that he had before that whistled for the Belt Line crossing, and had whistled for the dirt road crossing at the Bolen Coal Yard, which was six hun-

dred feet distant; that he had slowed up at the Belt Line crossing, which was twelve hundred feet distant, for the signal as to whether he should stop or go ahead; that after passing the Bolen Coal Yard he had whistled for the Lydia avenue crossing; and had received the signal from the flagman to come on and had whistled off brakes; that he stopped the train in about three car-lengths, which would be from one hundred and twenty to one hundred and thirty-five feet, after the deceased fell against the pilot; that from the time he first saw him until the engine got within ten or fifteen feet of the deceased he was standing by the water keg and was in a place of safety, and he saw nothing about him different from the ordinary section hand, but that when the engine got within ten or fifteen feet of him, the deceased "threw up his hands and stumbled like something was wrong, and just stumbled right up against the track and right up against the bumping beam. . . . I thought there was something wrong with him—taken with some ailment or other. He kept stumbling back." That the train was running from six to eight miles an hour.

Patrick Naughton, the flagman, was at the Lydia avenue crossing. He corroborated the engineer as to the whistles. He says he noticed the section hands at the Lydia avenue crossing, and saw one man at the water keg; that the latter started to turn around and stumbled and threw up his hands and fell against the pilot beam on the engine; that he could not tell exactly how close the engine was to the deceased when he commenced to turn around from the water keg, but it was not further than across the court room; that when the train was at the Bolen Coal Yards six hundred feet away, he signalled for it to come on, and then took eleven steps, and then he heard a whistle, and he looked and saw the deceased stumbling as aforesaid.

Frank Farrell, the fireman, said he was on the left-hand side of the engine. He corroborated the

engineer as to the whistling of the engine and as to the signals from the flagman; that he was sitting on the seat in the engine looking towards the east and ringing the bell; that he did not notice the man at the water keg, it being on the other side of the engine from him; that the track was clear ahead of him; that when the engine was about thirty feet west of Lydia avenue, the engineer began "tooting" the whistle and applied the air-brakes; that the train ran about one hundred and seventy-five feet before it was stopped; that the train was running from seven to eight miles an hour immediately before the accident.

Morris Sullivan, a section hand, was at the hand car about ninety feet east of the Lydia avenue crossing, and six or eight feet north of the track. He said that deceased had taken a drink of water and started east towards the hand car to help load it with cross-ties; that he heard a "warning whistle," and looked around and saw that the engine was within ten or fifteen feet of the deceased; that deceased was about ten feet east of the water keg and seemed to be standing still; that the engine then came between him and deceased and he did not see what happened afterwards; that there were "a few tools—picks and shovels around there."

On behalf of the plaintiff, Havens testified that in his judgment the train was running at the rate of eighteen to twenty miles an hour. He had no experience in such matters except riding on a train. He testified that he did not hear any whistle, but that his attention was directed towards the train by the remark of some one that the train was coming.

McConnell, a witness for the plaintiff, testified that he had worked on railroads off and on for twelve or fifteen years, and that in his opinion the train was running from eighteen to twenty miles an hour.

Vaughan, a witness for plaintiff, testified that he could not approximate how fast a train is running.

Frank A. Stamples, a witness for the plaintiff,

testified that he was a conductor in the employ of the defendant. He described the character of the train in question, being as hereinbefore stated, and said he took the names of all the persons who were around there at the time of the accident, and that McConnell was not there.

William J. Mathis, a witness for the plaintiff, testified that he was a stationary engineer, had been a locomotive engineer and a fireman, and had worked on a locomotive engine, other than as an engineer, for nine or ten years, had had no experience as an engineer on passenger trains, but had "fired" on passenger trains "considerably." He said a train of the character of this train when running at eighteen miles an hour, could be safely stopped "in the length of itself," which he said was two hundred and fifty feet, and if it was running at the rate of six or seven miles an hour it could be stopped in forty or fifty feet.

John W. Balbridge, a witness for the defendant, testified that he was a locomotive engineer and that he had been running a passenger train for twenty-seven years; that a train like this one when running at the rate of eighteen miles an hour, could be stopped in from five hundred and forty to six hundred feet, and that when running at a speed of six or eight miles an hour it can be stopped in one hundred and forty feet.

Peter Helm, a witness for the defendant, testified that he was a locomotive engineer and had been running an engine on the defendant's road for nineteen years. He said that a train like this when running six or eight miles an hour, could be stopped in about one hundred and fifty to two hundred feet, and if running at eighteen miles an hour it could be stopped in between four and five hundred feet.

At the close of the plaintiff's case and again at the close of the whole case, the defendant demurred to the evidence, the court overruled the demurrers and the defendant excepted. The case was submitted to the

jury upon instructions which are challenged here, but in view of what is hereinafter said it is not necessary to set them out. The jury returned a verdict for the plaintiff for five thousand dollars, and the defendant appealed.

## I.

The chief error assigned is the refusal of the trial court to direct a verdict for the defendant.

Two acts of negligence are assigned by the plaintiff as ground for a recovery: first, common-law negligence in running the train at a dangerous rate of speed "under the surroundings and circumstances," and, second, "negligently, carelessly and unskillfully" failing to stop the train in time to avoid the injury, after the defendant knew, or by the exercise of ordinary care could have known, of the peril of the deceased.

Of the first assignment of negligence it is only necessary to say: first, that "the surroundings and circumstances" were not such as to make a rate of speed of eighteen or twenty miles an hour negligence in itself, in respect to the duty of the defendant to its section hands engaged in the business of repairing the track. Second, there is no substantial evidence in the case that the train was running eighteen or twenty miles an hour, and the physical facts show this could not have been true. On behalf of the plaintiff there were only two witnesses who testified that the train was running eighteen or twenty miles an hour, and both of these were from two hundred and fifty to three hundred feet east of the place of accident and the train was approaching them. Havens did not qualify himself to give an opinion on the subject, and had had no experience with trains except to ride on them, and McConnell was a common laborer, and only attempted to qualify himself to express an opinion by saying he had "been on the road, off and on, for I would think twelve or fifteen years," although in what capacity he did

not state, nor in fact did he even say he had worked
on the road—simply that he had "been on the road"
and that "I think that I have a pretty good opinion of
it." The uncontradicted testimony is that the train
checked up at the Belt Line crossing which was about
twelve hundred feet west of the place of accident, and
in that space it could not reasonably be said that it
had attained a speed of eighteen or twenty miles an
hour after so having checked up. And, third: In view
of what is hereinafter said the speed of the train is
wholly immaterial in this case.

The second act of negligence assigned is the vital
question in this case.

The necessary, underlying postulate as to this
charge is, that the deceased was in a place of peril, and
the next ingredient necessary to a recovery is that the
defendant knew or by the exercise of ordinary care
could have known that he was in peril, in time to have
stopped the train and avoided the injury.

There is no controversy in the case that the de-
ceased was a section hand in the employ of the defend-
ant, nor that when the train was from two hundred to
six hundred feet from him he was standing at the
water keg, at a distance of at least six feet south of
the track. There can be no doubt in the mind of any
one that while in that position he was not in a place
of peril. The trainmen, therefore, had a right to
assume that he would remain in that safe position and
would not do anything towards thereafter placing him-
self in a position of danger and hence were not re-
quired to stop the train or check the speed. [Sharp v.
Railroad, 161 Mo. 214; Guyer v. Railroad, 174 Mo. 344;
Zumault v. Railroads, 175 Mo. 288; Carrier v. Rail-
road, 175 Mo. 470; Evans v. Railroad, 178 Mo. 508.]

In Evans v. Railroad, supra, BURGESS, J., speaking
for the court, said:

"But plaintiff claims that even if deceased was
guilty of negligence, yet if defendant's employees in

charge of the train became aware of his peril, or might, by the exercise of ordinary care, have become aware of it, in time to have enabled them by the exercise of ordinary care to have averted the injury, and they failed to exercise such care, plaintiff was entitled to recover. It will not do to apply this rule in all of its strictness to section men whose business it is to work upon and keep in repair railroad tracks, for they are supposed to look after their own personal safety, and to know of the time at which trains pass, to look for them and see them, and to move out of the way. It is of common knowledge that these men often voluntarily wait until trains get dangerously close to them, and then step out of danger and let them pass by, and to require trains to stop upon all such occasions, when section men are discovered at work on the track, would not only be imposing upon railroads unjust burdens, but would greatly interfere with traffic and travel. Those in charge of trains have the right to presume in the first place that such persons will keep out of danger, and not until they have good reason to believe they will not do so, and then fail to use all proper means at their command to prevent injuring them, in consequence of which they are injured, or are injured by reason of the willful negligence of those in charge of the train, should the defendant be held liable, and there was nothing of that kind in this case. Our conclusion is that the demurrer to the evidence interposed by defendant should have been sustained."

Giving the fullest possible effect to the testimony of the plaintiff's witnesses, the result is that the deceased was in a place of safety; that after taking a drink of water he started to turn around, and his feet seemed to become "tangled up" with some tools that were lying on the ground and that he staggered backwards and just as the pilot of the engine got opposite to him he "pitched over sideways" and fell against the pilot. Assuming as plaintiff's witnesses say that the

train was from two hundred to six hundred feet dis-
tant when he became so "tangled up," he was still in
a place of safety. He was not on the track or so close
to it as to be struck by the passing train. If he could
not move, all he would have had to do was to be still
until the train passed him and he could then have ex-
tricated himself at his leisure. A person of the slight-
est prudence would have done that. But assuming that
he persisted in struggling to free himself from the
tenacious tools that imprisoned his feet, the engineer
saw that he was not on the track and was in a safe
position, and would not be hurt by the passing train,
whether the train was running at twenty miles an hour
or only at six miles an hour. The engineer could not be
charged with the duty of foreknowing that in his strug-
gles he would be "pitched over sideways" so as to
strike the pilot on the engine. Consequently the engi-
neer was under no obligation to stop the train or slow
its speed at that time. If the testimony of the plain-
tiff's witnesses as to the rate of speed that the train
was moving, to-wit, eighteen or twenty miles an hour,
could be accepted as correct, it would be travelling
thirty feet a second, and at this rate it would travel
two hundred feet in six and two-thirds seconds, or it
would travel six hundred feet in twenty seconds. The
result is that even on this hypothesis the plaintiff was
in a place of safety up to a period of time varying from
six and two-thirds seconds to twenty seconds before the
injury occurred. In fact, however, he never was in a
place of peril until he commenced to "pitch" sideways
towards the track. If he had "pitched" forward or
backward, he would never have been in a position of
peril. The plaintiff's case therefore requires the court
to hold that the engineer should have known that the
deceased would so struggle or stagger that he would
"pitch sideways" towards the track and not forward
or backward. For there is no controversy that be-

tween the time he began to ''pitch sideways'' and the time he struck the train, there was not time enough to have stopped the train and avoided the injury.

The physics of the case also show this to be true. For it certainly would not take six and two-thirds or twenty seconds for a man to fall down after he commenced to ''pitch sideways.''

This is all upon the theory that the testimony of the plaintiff's witnesses is absolutely true. They were from two hundred to three hundred feet away from the place of the accident, and were mere casual observers. The testimony of the engineer and of the flagman is that the deceased was not in a place of peril and did not commence to stagger towards the train until the engine was within from ten to thirty feet of him, and then the engineer sounded the warning whistle, applied the air-brakes and stopped the train in about one hundred and twenty to one hundred and thirty-five feet—which fact tends to show that it must have been running at a less rate of speed than eighteen or twenty miles an hour, for if it was running at that rate, a stop made in about four seconds would be hazardous to the safety of the passengers on the train.

Upon the case made, therefore, it is apparent that the humanitarian doctrine has no application. There is no evidence or charge of any wantonness on the part of the trainmen, and nothing from which an inference of intentional suicide on the part of the deceased can be drawn. It was, therefore, an unforeseen accident, which could not have been anticipated or avoided. There was no negligence on the part of the defendant shown, and hence the defendant is not liable. The trial court should have directed a verdict for the defendant. The judgment is, therefore, reversed, and as no good could come of a trial anew, the cause is not remanded. All concur, except *Robinson, J.,* absent.