## MISSOURI, K. & T. RY. CO. v. GILBREATH.

No. 6841.   Opinion Filed January 11, 1916.

(154 Pac. 539.)

**MASTER AND SERVANT—Death of Railroad Employee—Negligence.**
G., an acting· section boss in the employ of a railway company, in due time got off the track upon which a passenger train was approaching to let the train go by, and thereafter, when the train was almost upon him, returned to the track from a place of safety and was hit by the train and killed. **Held,** that there was no duty upon the part of the engineer of the passenger train, who observed the action of the deceased, to ring the bell or sound the whistle to attract his attention to the approaching train, there being nothing to indicate that he intended to step on the track in front of the engine or that thereafter the engine could have been stopped, or the injury avoided.

(Syllabus by the Court.)

*Error from District Court, Bryan County;*
*Summers Hardy, Special Judge.*

Action by Emma Gilbreath, administratrix of the estate of B. F. Gilbreath, deceased, against the Missouri, Kansas & Texas Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with directions to grant new trial.

*Clifford L. Jackson, W. R. Allen,* and *M. D. Green,* for plaintiff in error.

*W. F. Semple* and *Hatchett & Ferguson,* for defendant in error.

KANE, C. J.   This was an action for personal injuries resulting in death, commenced by the defendant in error, plaintiff below, against plaintiff in error, defendant below, pursuant to the federal Employes' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S.

Comp. St. 1913, sections 8657-8665]). Hereafter the parties will be called "plaintiff" and "defendant," respectively, as they were designated in the court below. Upon trial to a jury there was verdict for the plaintiff in the sum of $4,000, to reverse which this proceeding in error was commenced.

The first assignment of error—and, in view of the conclusion we have reached, the only one necessary to be noticed—is:

"The trial court erred in overruling the demurrer to the evidence which was interposed by the plaintiff in error at the close of all the evidence on the part of the defendant."

The decedent was a section hand employed by the defendant company, who, at the time of the injury, was acting as boss of the gang in place of the regular section boss, who was temporarily absent. The specific act of negligence relied upon by counsel for plaintiff was the failure of the engineer of the "Flyer" to sound the whistle or ring the bell to warn the section men of the approach of his train.

The facts and circumstances surrounding the injury may be fairly summarized from the testimony of B. M. Flannery, a witness on behalf of the plaintiff, substantially as follows:

I am now and was during the month of August, 1912, a fireman on a freight train for the Missouri, Kansas & Texas Railway Company and recall the death of B. F. Gilbreath. I was at the time sitting on the seat box of the engine No. 634 of the north-bound freight train. There were double tracks at the point of the accident. When I first saw Mr. Gilbreath so I could distinguish him from others he started towards the track from the west side like he was starting to cross the

track. I had seen him and the other section hands before that time. When I first saw them they were working on the south-bound track, and they all got off of the track and went on the west side, part of them stood on the top of the bank and a part along down off of the bank. The "Katy Flyer" train No. 5 was coming south on this south-bound track and passed this point somewhere about 4 o'clock. When the men got off of the track the Flyer was a good ways off. We were going north and I just happened to look and saw the men get off to let the Flyer by. When the Flyer was about 200 feet from the section men I saw one, who was Mr. Gilbreath, start across the track in front of it. He got to the middle of the track or a little to the east side between the rails and stooped over like he was going to pick up something with his back to the Flyer, and by that time our engine got right even with him and the Flyer's engine hit him. He had just gotten there when he was struck. I did not see anything that he was attempting to pick up. I don't remember of hearing the Flyer whistle or ring the bell. At the time Mr. Gilbreath started on the track I hallooed at him as loud as I could, but I do not suppose he could have heard me. He was hit before I was through hallooing.

The testimony of Mr. Honell, the engineer upon the "Katy Flyer," who testified for the defendant, was not substantially different from the foregoing, except that he testified positively that the ordinary signals were given. It may be summarized as follows:

I have been a licensed locomotive engineer for 16 years and have been working for the Missouri, Kansas & Texas since 1892, and have been four years in the passenger service. I was in charge of the engine that struck Mr. Gilbreath. When approaching Calera I sounded the station whistle and started the bell ringer, and at the required distance before coming to the crossing in front of the depot I sounded the crossing whistle. About the

time I was passing the depot I saw section men working down south of the station. I also saw the freight train approaching from the south quite a distance from the station on the north-bound track, and I sounded the crossing signal just after passing the depot for the crossing at the south end of Calera and also to warn the section men. The section men did not get off the track until I whistled the crossing whistle. They then left the track and started over to the west side. All of them cleared the track and got into a place of safety. The bell rings automatically. In order to start it you turn a little valve and it rings until you shut it off. All at once I saw a man run up onto the track, and, being so close to him, I was worried and expected to strike him, and at once sounded several short blasts of the whistle. The engine was about 90 feet from him when he ran onto the track. The running board partly obstructed my view of him by him being so close to the engine. At first I could see him about to his knees, and finally he got so I could not see him at all. If he had been 20 or 30 feet further away I could have seen him. The running board is the board running from the cab window at the side of the boiler to enable the engineer to step out of his cab window to walk around the boiler in the event that anything goes wrong. I could not see Mr. Gilbreath when he was struck. My train was running from 45 to 50 miles an hour. It is a fast train and maintains about the same schedule as the trains known as the Limited and Kansas City Special. The Flyer and these other trains are the fastest trains on this system. Calera is not a stop for the Flyer and I was running about the usual rate of speed. After Mr. Gilbreath stepped upon the track there was nothing that I could have done to avoid the accident. It was impossible to have stopped the train in that short distance. I applied the brakes, but I knew that I could not stop and avoid striking him. The train ran I should judge 900 or 1,000 feet before stopping. This was a fairly good stop for a train of this kind. The track was downgrade.

There were other witnesses who testified for the respective parties, but there was practically no conflict in the evidence as summarized above, unless it was upon the question whether the engineer of the "Flyer" rang the bell and sounded the whistle to attract the attention of the deceased to the approaching train.

No matter how deeply we may sympathize with the plaintiff, there can be no escape from the conclusion that the testimony of her own witnesses conclusively shows that the injury which caused the death of her husband was the result of an unavoidable accident in so far as the railway company is concerned, for which no recovery can be had under the law as it existed at the time the injury occurred. It may be conceded, generally, that it would be the duty of the engineer to warn the deceased of the approach of the "Flyer" by ringing the bell and blowing the whistle, and that he did not do so, and still, owing to the special circumstances of this case, the plaintiff would be in no better situation. The engineers on the south-bound "Flyer" and the north-bound freight train both testified that they saw the decedent get off the track "to let the Flyer by" whilst yet it was "a good ways off," and the testimony of the former, to the effect that after the deceased returned to the track there was nothing that could have been done which would have averted the accident, is uncontroverted. There is some contention on the part of counsel to the effect that there was no evidence that the deceased knew the Flyer was approaching upon the track upon which he was working, or that he got off the track to let it go by. In this we think counsel are in error. The engineer on the freight train testified on that question as follows:

"Well, the Flyer was a good ways off when I first seen them and they got off the track. We was coming north and I just happened to look and saw the section men there, and as I seen them they all got off to let the Flyer by. I just thought in my mind that they got off to let the Flyer by and there wasn't anybody in the way."

It may be urged that the statement that the deceased got off the track "to let the Flyer by" was a mere conclusion of the witness, but even so, it was the only conclusion which reasonably could be reached from the facts and circumstances of the case, and if the jury found differently on that point—and there is nothing in the record to indicate that they did—such a finding clearly would not be supported by the evidence. It seems to us in such circumstances that negligence cannot be based upon the failure of the engineer to ring the bell or sound the whistle to warn the trackmen of the approach of his train when it was obvious to him that they had knowledge of this fact. The contingency that the deceased would leave a place of safety and return to the track immediately in front of the rapidly approaching passenger train, after having gone to such place of safety "to let the Flyer by," is too remote to be seriously considered.

However, there is nothing in the record to indicate that the jury so found, except the return of a verdict in favor of the plaintiff; and from an examination of the authorities cited by counsel and the instructions given by the court, we think it quite likely that the verdict is more the result of the action of the trial court in applying to the facts non-applicable principles of law than of error in the findings of fact themselves by the jury. Counsel insist, and the trial court seems to have

taken the view, that the law applicable to this case is stated in 2 Thompson on Negligence, par. 1756, as follows:

"The position of track walkers, track repairers, and especially that of car repairers, is materially different, in respect of the question of their contributory negligence, from that of ordinary travelers at highway crossings, and still more so from that of trespassers. They are not only lawfully upon the railway track and hence in a position of danger, but they are there under contract with the railway company for the performance of certain duties which require, to a greater or less extent, the exercise of their faculties, in the performance of which their faculties may become so absorbed as not to enable them to take the same care for their safety which might reasonably be expected from travelers at crossings and from intruders upon railway tracks or in railway yards. These considerations impose upon the railway company, with peculiar force, the duty of giving them warning upon the approach of a train or engine, by the use of audible signals, and by checking or stopping the train or engine in time to avoid injuring them, if the engineer perceives that, for any reason, they are not paying attention to those signals. As a general rule, it is not contributory negligence, as matter of law, for a person so employed not to be on a constant lookout for approaching trains. This must be so if we are paying the slightest attention to the position of a man who is fastening a fishplate, or who is oiling or repairing the wheel of a car on a passenger train which has stopped temporarily at a station for that purpose. Such a person cannot keep his eyes on his work, and at the same time keep them strained in both directions for approaching trains, or for ocular signals. Such persons are therefore not blameworthy, as matter of law, merely because they become so engrossed in their work as not to heed the approach of a train, or because they rely upon the reasonable expectation that the railway company will, through its trainmen, perform the duty of

giving them the necessary and proper signals. But it does not follow from these considerations that contributory negligence will be wholly excused, even in persons thus engaged. For example, the duties of a track walker are manifestly not so absorbing as to relieve him from the obligation of exercising reasonable care for his own safety, by looking and listening for approaching trains. On the other hand, if he is seen by those in charge of the train to be absorbed upon some object so that he does not heed the approaching train, and they run him down, the company will be liable."

We find no fault with the law as above laid down by Judge Thompson in his admirable text-book, but do not believe it has any application to the facts in the case before us. He was discussing the law from the standpoint of the contributory negligence of the plaintiff; whilst in the case at bar the question under discussion is the primary negligence of the defendant. In this jurisdiction, by constitutional provision, if there is evidence tending to show primary negligence on the part of a railway company, the question of contributory negligence is always a question of fact which must be submitted to the jury. Section 6, art. 23, Williams' Constitution.

The law as stated in the text is applicable to the cases where the person injured was, or appeared to be, so absorbed in his occupation that he remained at his post of duty unmindful of the approaching train until he was run down and injured. As we have already shown, that is not the class of cases to which the case at bar belongs; nor does it belong to the class of cases which counsel cite in support of their position. From one of them, *Sullivan v. Mo. Pac. Ry. Co.*, 97 Mo. 113, 10 S. W. 852, we quote the following:

"* * * Indeed, although the fireman and engineer saw Sullivan on the track, and saw that his attention was attracted to the steam shovel, still there is evidence that no signal was given until the instant the engine struck him."

From another, *St. Louis, I. M. & So. Ry., Co. v. Jackson*, 78 Ark. 100, 93 S. W. 746, 6 L. R. A. (N. S.) 646, 8 Ann. Cas. 328, we quote the following:

"Now, in the case at bar, there was affirmative evidence to the effect that the work of tamping gravel under the ties required some care and attention, and the plaintiff's intestate was stooping over, engaged in this work with his back to the approaching train."

In another, *Schulz v. Chicago, M. & St. P. Ry. Co.*, 57 Minn. 271, 59 N. W. 192, we find the following:

"The track on which this train was approaching was straight for about 1,800 feet, and the deceased could be seen for that distance before the train reached him. It was a question for the jury whether the persons managing the train, if they had been exercising proper care, would not have discovered that deceased was unaware of its approach."

The distinction between the case at bar and the foregoing and the other cases of the same class cited by counsel for plaintiff, while quite obvious, may be further emphasized by comparing them with a few cases to which it is more nearly analogous. In *N. Y., N. H. & Hudson Ry. Co. v. Pontillo*, 211 Fed. 331, 128 C. C. A. 573, the deceased, a track walker, was walking beside the track in a place of safety. He was not in view of the engineer, but was in view of the fireman. The train was moving about 15 miles an hour. The bell was ringing. The deceased stepped upon the track when the train was about ten feet from him. It was con-

tended that the fireman should have given notice to the engineer of the presence of the deceased, and that the whistle should have been sounded to warn him of the approaching train. The court held that:

"The contingency that he would step out on the main track directly in front of a passenger train at the precise moment that it was due at that point without turning his head, seems too remote to be seriously considered."

In *Land v. St. L. & S. F. R. Co.*, 95 Kan. 441, 148 Pac. 612, the deceased was a section foreman. The accident occurred at a place where there were double tracks. The south-bound train passed on the west track, emitting a large amount of steam and smoke, which settled down over the tracks, obscuring the view. After the train passed the deceased walked over the west track and walked a short distance south between the parallel tracks and then attempted to cross the east track and was struck. The train was going at about 45 miles an hour. It was claimed that crossing signals were not given, and that the train was moving at a high rate of speed. The jury found that no signals were given until the deceased was discovered on the track, at which time it was too late to avoid the accident. The court said:

"Railroads must operate their passenger trains and transport their passengers without impeding their progress or imperiling their safety by the necessity of making it a condition precedent to see if its section men, employed for the purpose of keeping the track safe while trains are running over it, are themselves looking out for their approach. Of course, when those in charge of the engine discover a section hand in a place of danger from which it becomes apparent that he will not or

cannot protect himself, they must use due care to avoid injuring him, but ordinarily a greater burden than this they are not called upon to exercise."

In *Helm v. Mo. Pac. Ry. Co.*, 185 Mo. 212, 84 S. W. 5, the injured person, a section laborer, was standing near the track in a place of safety drinking water from a keg. Upon the approach of the train which hit him he in some way got his feet tangled with some shovels or tools and fell upon the track, where he was hit by the train. The court said:

"The necessary, underlying postulate as to this charge is that the deceased was in a place of peril, and the next ingredient necessary to a recovery is that the defendant knew, or by the exercise of ordinary care could have known, that he was in peril, in time to have stopped the train and avoid the injury. There is no controversy in the case that the deceased was a section hand in the employ of the defendant, nor that, when the train was from 200 to 600 feet from him, he was standing at the water keg, at a distance of at least six feet south of the track. There can be no doubt in the mind of any one that while in that position he was not in a place of peril. The trainmen, therefore, had a right to assume that he would remain in that safe position, and would not do anything towards thereafter placing himself in a position of danger, and hence were not required to stop the train or check the speed."

In another case, which is probably more nearly analogous to the case at bar than any other called to our attention, *St. L. & I. M. Ry. Co. v. Lawrence*, 106 Ark. 32, 152 S. W. 1002, the deceased was a section foreman. He knew of the approach of the train, and had removed a speeder from the track, and thereafter started back onto the track when the train was from three to five telegraph poles distant, and stooped over to pick up some-

thing from the track. It was contended on the part of the plaintiff that the deceased went upon the track to pick up a jack, which might have endangered the safety of the train. The court, however, deemed these different circumstances as to the purpose for which he went upon the track immaterial. Answering the contention of counsel that the engineer should have put the engine under control, that its speed should have been so reduced that by application of the air the train could have been stopped, or its speed reduced, when it seemed that the injured person was stooping over the track as if to remove something from it, the court say:

"This would be the law if it appeared that there was anything in the situation of the persons upon the track which made it appear that they were unaware of the danger of their situation. But there was no such duty here. All the persons on the track were section men, whose business it was to make the track safe for the passage of trains, and who were charged with notice that trains might run at any time; and it not only appeared to the engineer that they were all aware of the approaching engine, but such was actually the fact, and both cars were removed to a place of safety."

We think the foregoing authorities are sufficient to make clear the precise point upon which the case before us turns, and that it belongs to the latter class of cases, and not the former. When the case is properly classified, the conclusion reached here is supported by an unbroken line of authorities.

For the reason stated, the judgment of the court below is reversed and the cause remanded, with directions to grant a new trial.

All the Justices concur, except HARDY, J., who was disqualified and not sitting.