No. 19,466.

S. M. LAND, as Administrator, etc., *Appellee*, v. THE
ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY,
*Appellant.*

SYLLABUS BY THE COURT.

1. RAILWAYS—*Death of Section Man—Duty of Railroad Com-
pany—Signals—Warnings—Speed of Train.* Railroad com-
panies in the operation of their roads may rightfully assume
that their section men while at work upon or along the track
will look out for the approach and passage of trains at all
times, and ordinarily such companies owe to their section men
no duty to warn them of the approach of trains save when
such employees are found to be in a place of danger and it
becomes apparent that they will not or can not protect them-
selves.

2. SAME—*Speed of Train—Negligence.* Ordinarily it is not, and
under the facts of this case it was not, negligence towards
the section foreman to run a passenger train at a speed of
forty-five miles an hour.

3. SAME. Crossing signals are not intended or required for the
benefit of section men at work upon or along the track near
a crossing, and the failure to give such signals is not negli-
gence as to such employees thus engaged; and this rule is
not changed by the fact that a preceding train going in the
opposite direction on one of the two tracks has left the other
track enveloped in steam and smoke, such condition requiring
added vigilance on the part of such employees to protect
themselves.

Appeal from Bourbon district court; CHARLES E.
HULETT, judge. Opinion filed May 8, 1915. Reversed.

*R. R. Vermilion,* and *W. F. Lilleston,* both of Wich-
ita, for the appellant; *W. F. Evans,* of St. Louis, of
counsel.

*J. I. Sheppard, James G. Sheppard, Kate Sheppard,*
and *A. M. Keene,* all of Fort Scott, for the appellee.

The opinion of the court was delivered by

WEST, J.: This action was brought by the adminis-
trator of the estate of Samuel H. Simmons to recover
for his death caused by one of the defendant's engines.

The decedent was foreman of the section extending from Fort Scott south to Edwards Junction, between which points there is a double track. It was alleged that at the National avenue crossing, near the southeast limits of Fort Scott, on the morning in question the deceased was standing while a southbound freight train passed on the west of the two tracks, and owing to the heavy grade and weight of the train the engine was emitting a large amount of steam and smoke, the atmosphere being very heavy, there being no wind or breeze so that the steam and smoke made it almost impossible to see for any distance; that as soon as the freight train passed the deceased crossed over the west track and walked for a short distance south between the two parallel tracks and then attempted to cross the east track when he was struck and instantly killed by a northbound passenger train operated by the defendant. It was charged that the death was caused "by reason and on account of the following wrongful and negligent and reckless and careless acts and omissions of defendant and its servants and employees; in negligently approaching said place where said large amount of smoke and steam was gathered and in negligently approaching said Samuel H. Simmons and in negligently approaching said National avenue with said passenger engine at the higher rate of speed than twenty-five miles per hour, to wit, at about the rate of forty-five miles per hour, and in negligently and carelessly and wrongfully failing and neglecting to blow the whistle and ring the bell of said passenger engine when it approached said place where said large amount of smoke and steam was gathered and when it approached said National avenue and when it approached said Samuel H. Simmons."

The action was prosecuted under the federal employer's liability act (Part 1, 35 U. S. Stat. at Large, ch. 149, 4 U. S. Comp. Stat. 1913, §§ 8657-8665), the defendant being engaged in interstate commerce. The

account of the occurrence as detailed by the plaintiff's witnesses was in substance that the foreman and his men were working south from Fourth street in the city of Fort Scott; that on reaching National avenue crossing the hand car was placed on the west side of the west track, shortly after which a freight train of some fifteen or eighteen cars besides the engine and caboose passed south on the west track, the engine emitting a large amount of smoke and steam. One witness testified that the engine was throwing steam all the way from town up; that it covered the east track and extended back from the engine at the time of the collision almost the entire length of the train.

"It covered the east track, all along the east side of that train running south. You couldn't see a man any distance at all in it. That was true all along the east side of that train. I remember when the caboose reached the avenue—the caboose of the train that passed."

As Mr. Simmons walked around the caboose and up between the tracks the freight train was moving south a very little faster than a man could walk at a good gait.

"I never discovered him any more. I was looking back towards town to see if there was another freight following this one. I did not see any object there in connection with any other train on the east track there. Just after Mr. Simmons passed the cattle guard south through this steam, I discovered an object, but I couldn't tell exactly what it was, run by this freight train. Train No. 106 came north on the east track, passing that freight train that morning, yes sir. With reference to when Mr. Simmons went around the rear end of the caboose of the freight train and started south there, I did not see this train come up on the east track there. After Simmons went around there I did not see any object at all. I did not see the passenger train come north until after it had run through that steam. As it came through the steam I seen a dark object roll off of the pilot and afterwards discovered it was Mr. Simmons. . . . When I saw this object roll off of the pilot of the train, the steam had not evaporated enough so I could tell

who or what it was. I could see the dark object of the engine, just about the time it struck Simmons. That was somewhere about three hundred feet from where I was standing. . . . After Mr. Simmons passed the cattle guard going south, I did not see him until I saw the dark object pitch off the track by the pilot of 106. . . . I saw Mr. Simmons going south there after he passed behind the caboose of the freight train, not more than five or six steps south of the cattle guards. What prevented me from seeing him from there on, was the steam in the way. There was quite a large batch of steam there along the whole east track there, along that freight train. . . . Could n't have seen him over—well not over ten steps, anyway. That was on account of the steam. As to the steam covering the entire east track up as far as the freight train, I didn't notice anything at all but a large body of steam."

Before Mr. Simmons started south it was suggested that the hand car be put back on the track, and it appears that he directed that this be not done as No. 106 was due. Another witness who appears to have seen the northbound passenger as it was leaving Edwards Junction testified that as the freight train passed, going south, there was much steam filling up the track on the east side; that when Mr. Simmons started to go around the caboose the witness could not see him after-wards on account of the steam. "Q. As it, [106,] went across the avenue, did you see Mr. Simmons' body on the pilot of the engine? A. I did n't see whether it was him or not, I could n't say whether it was him or not, until after it done got by. Q. What prevented you from seeing plainer what it was that fell off of the pilot of that engine? A. Smoke and gas and steam from that engine." This witness testified that when it was suggested to put the hand car on the track Mr. Simmons stated, "Six is on time. It may not be here for an hour yet." Edwards Junction is about two and one-half miles south of the crossing in question.

The jury found for the plaintiff, answering that they did not know how far the passenger train was away

from the deceased when he stepped on the east track where he was struck. As to what there was to prevent him from observing the approaching train they answered, "Steam, smoke and noise of south-bound freight train." They found that the engineer or fireman began whistling an alarm as soon as he discovered the deceased on the track and set the air brake in emergency, but that just prior to the collision the engine bell was not ringing; that they did not know whether the deceased could have seen the train coming if he had looked at or about the same time the witness testified that he looked.

"10. If you find for plaintiff, please state in what respects, if any, defendant was negligent on the occasion complained of, and through what employees, if any, defendant was thus negligent. A. By high rate of speed and crew on train No. 106."

It will be observed, therefore, that while the petition alleged that the negligence consisted of the dangerous rate of speed and failure to blow the whistle and ring the bell the only negligence found by the jury was the high rate of speed, which was shown to have been about forty-five miles an hour. While they did not find (No. 8) that the engine bell was ringing just prior to and at the time of the collision, they did not seem to regard this as negligence, and as will be seen later, crossing signals are not required for employees working on the track, hence the recent decision in *Springer v. Railroad Co.*, ante, p. 408, does not apply as to the findings, and speed remains the only element of negligence found.

It is contended by the defendant that no negligence was shown on its part. It is argued that the deceased, knowing as he did that No. 106 was due and having given this as a reason for leaving the hand car off the track, knew that the northbound passenger was likely to be along at any time, and that the defendant owed him no duty of giving warning of the approach of its train to the crossing, and that so far as the plaintiff was

concerned it had a right to run its train as it did and to assume that the deceased would keep out of its way. The engineer testified that Mr. Simmons was about one hundred and fifty feet ahead of the engine when he first saw him on the track; that he came on the track from the west side, crossed and stood on the end of the ties outside of the rail on the east track when he was struck; that he stood there perfectly still looking to the west. The fireman stated that when he first saw the deceased the engine was about a hundred yards from him; that he was going across the east track from the west. It is urged that having been thus seen by these men he must have seen the engine from which they observed him, and that as the steam and smoke did not prevent their seeing him it could not have prevented his seeing the approaching train. This is not a case involving the duties of a watchman like *Glenn v. Railroad Co.*, 94 Kan. 83, 145 Pac. 865, for here the section foreman was of necessity his own watchman. There is no charge of failure to keep a lookout, and the proof shows that the fireman and engineer each saw the deceased too late to stop but apparently not too late for him to have stepped back and avoided the collision. The jury based their verdict on the speed of the train, and if such speed did not constitute negligence the verdict can not stand.

Railroads must operate their passenger trains and transport their passengers without impeding their progress or imperiling their safety by the necessity of making it a condition precedent to see if its section men, employed for the purpose of keeping the track safe while trains are running over it, are themselves looking out for their approach. Of course when those in charge of the engine discover a section hand in a place of danger from which it becomes apparent that he will not or can not protect himself they must use due care to avoid injuring him, but ordinarily a greater

burden than this they are not called upon to exercise. Counsel say in their brief:

"While speed of itself may not as a matter of cold law be negligence, yet it certainly was negligence under the circumstances in this case, and the findings of the jury that such was negligence is conclusive as it was a matter for the jury to determine and having so found and the verdict having been approved by the lower court, the appellee thinks it is not within the province of this honorable court to disturb that finding and verdict."

As to the warnings for the crossing the jury did not, except as to ringing the bell, find in favor of the plaintiff, and, besides, such warnings were required for the benefit of those about to pass over the crossing and not for the defendant's own employees who were waiting there for an opportunity to resume work.   (*St. L. & S. F. Rly. Co. v. Payne*, 29 Kan. 166; *Mo. Pac. Rly. Co. v. Pierce*, 33 Kan. 61, 5 Pac. 378; *Clark v. Mo. Pac. Rly. Co.*, 35 Kan. 350, 11 Pac. 134; *Marklinger v. Railroad Co.*, ante, p. 69, 147 Pac. 1132.)

A high rate of speed is not necessarily negligence, and it has been held that in the country where there is no statutory or municipal regulation "there is no limit upon the speed at which trains may be run, except that of a careful regard for the safety of trains and passengers." (*A. T. & S. F. Rld. Co. v. Hague*, 54 Kan. 284, 294, 38 Pac. 257.)   That case was one involving an injury at a crossing suffered by one who had no connection or employment with the road.   In *Railway Co. v. Judah*, 65 Kan. 474, 70 Pac. 346, it was held that "In an open country where the view of a traveler on the highway is unobstructed, a railway company is not chargeable with negligence in running its passenger trains over a road crossing at a speed of forty to fifty miles per hour."   (Syl. ¶ 2.)   There, too, the jury in answer to a question what constituted negligence said:

"Excessive rate of speed over a crossing which had an unusual amount of travel over same, and failing to provide proper and reasonable precaution."   (p. 476.)

The ruling in the Hague case was followed and the judgment was reversed with directions to enter judgment for the defendant.   In the opinion it was said:

"While there was considerable travel over this crossing, yet it was not in the corporate limits of a city but in the country.  It has been held by this court that in such cases speed can not be made an element of danger."   (p. 477.)

In *Railway Co. v. Schriver*, 80 Kan. 540, 130 Pac. 994, it was ruled that a traveler at an ordinary country crossing who sees an approaching passenger train "must assume that such train may be running at any rate of speed which the business or necessities of the company require, and act accordingly."   (Syl. ¶ 2.) In the opinion it was said:

"It is now generally understood that an unusually high rate of speed is not of itself improper or negligent. In the open country, where no peculiar conditions exist which make it dangerous, and speed is not limited by statute, trains may be operated at any speed which the existing exigencies of public travel seem to require." (p. 543.)

(See, also, *Adams v. Railway Co.,* 93 Kan. 475, 479, 144 Pac. 999.)

It follows naturally and logically that a railroad in respect to the speed of its trains can hardly owe a higher duty to a section man than to a stranger about to cross the track, and if such stranger must expect such speed as the exigencies of the traffic seem to require by so much the more must the trackman himself expect it.   Practically, if it were incumbent upon the engineer to modify the speed of a train whenever passing through fog or steam in order to avoid collision with the section men the service demanded and deserved by the public could no longer be assured.   Trackmen are employed for the very object of enabling the road to furnish such service and can not require the employer to impair its efficency by acting as watchman for them.

These views find support in the decisions of numerous courts, though usually from the standpoint of assumption of risk rather than from that of duty to warn. In *Hinz v. Chicago, Burlington & Northern R. Co.*, 93 Wis. 16, 66 N. W. 718, it was said in the opinion, speaking of another case:

"W. was employed as a trackman; he was proceeding on a hand car to his work of repairing the track; there was a dense fog; the noise of the hand car was such that he could not hear an approaching train; he knew that he was not on the time of any regular or scheduled train, but that extra trains were likely to be run at any time." (p. 19.)

It was held that he took upon himself all the risks of the service he was engaged in. The same result was reached in *Ives v. Wis. Cent. R. Co.*, 128 Wis. 357, 107 N. W. 452, although the train was run at an unlawful speed within the limits of the city and the section man was proceeding along the track under the orders of the foreman. In *Morris v. Boston & Maine Railroad*, 184 Mass. 368, 68 N. E. 680, in holding the railroad company not liable to a section hand who was run into by a wild engine pushing a snow plow, it was said:

"By the nature of his employment a section hand on a steam railroad must look out for passing trains, and such is the settled law of the Commonwealth. (Citing authorities.) The rule of law is the same elsewhere. (*Aerkfetz v. Humphreys*, 145 U. S. 418; *Pennsylvania Railroad v. Wachter*, 60 Md. 395; *Carlson v. Cincinnati, Saginaw & Mackinaw Railroad*, 120 Mich. 481, 79 N. W. 688.)" (p. 371.)

In *Riccio v. New York, N. H. & H. Railroad*, 189 Mass. 358, 75 N. E. 704, the deceased was shoveling snow in a railroad yard where he knew that trains and engines were frequently passing and that he was expected to look out for himself, and was struck by an engine. It was held that the company was not guilty of actionable negligence though the engineer failed to sound the whistle or ring the bell. In

29—95 KAN.

*Norfolk & W. Ry. Co. v. Gesswine,* 144 Fed. 56, 75 C. C. A. 214, it was sought to hold the railway company liable because, as known by the person injured, it was customary for the train which struck him to go through the limits of the city not to exceed ten to fifteen miles an hour, but on the occasion in question it ran upon him at a speed of forty-five to fifty miles an hour through a dense fog, but it was held that neither this nor the failure to use the crossing signal rendered the company liable. In *Connelley v. Pennsylvania R. Co.,* 201 Fed. 54, 119 C. C. A. 392, 47 L. R. A., n. s., 867, two track walkers, experienced men, stopped to make repairs while enveloped in steam escaping from a standing engine, a brakeman on watch had the emergency brake ready, but on account of the steam could not see the men and they could not see the approaching train. It was held that the company was not guilty of any breach of duty in running upon one of these track walkers and was not liable for his death. In *Loring v. K. C., Ft. S. & M. R'y Co.,* 128 Mo. 349, 31 S. W. 6, it was said:

"If the law exacts of a traveler upon a highway the duty of looking and listening, *a fortiori* it demands of an employee, familiar with the usages and dangers of a switch yard, that he look before he steps upon a track upon which his daily experience teaches him a train, or an engine, may pass at any moment." (p. 359.)

The majority of the court holding as already indicated, it is not necessary to consider various other points presented, including assumption of risk. No failure of duty and therefore no negligence on the part of the defendant being shown no recovery can be had, and the judgment is reversed with directions to enter judgment for the defendant.

WEST, J. (dissenting) : Laying aside the question of assumed risk and considering the matter of the defendant's negligence only, it would seem that the whistle could have been sounded (*Hingeman v. Rail-*

*road,* 199 Mo. 56, 94 S. W. 973), and the bell could have been kept ringing for the few seconds required to come down grade through the fog and steam, without impairment of service, and that such precaution, under the peculiar conditions shown, might well be deemed reasonable and of possible efficiency to have averted the disaster. I am not convinced that as a clear matter of law there was no evidence of negligence to go to the jury, and therefore dissent.