No. 38,445

F. Eva Modlin, Administratrix of the Estate of Clarence C. Modlin, Deceased, *Appellee,* v. Consumers Cooperative Association and American Fidelity and Casualty Company, Inc., *Appellants.*

(241 P. 2d 692)

Opinion filed March 8, 1952.

*Irwin Snattinger,* of Topeka, and *Sam Mandell,* of Kansas City, Missouri, both argued the cause, and were on the briefs for the appellants.

*J. E. DuMars,* of Topeka, argued the cause, and *Clayton M. Davis* and *Mark L. Bennett,* both of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Parker, J.: This is an appeal by the Consumers Cooperative Association and its insurance carrier, American Fidelity Casualty Company, Inc., from a judgment rendered against them for damages on a verdict returned by a jury in an action instituted by F. Eva Modlin, as administratrix of the estate of Clarence C. Modlin, a deceased railroad engineer, under the wrongful death statute (G. S. 1947 Supp. 60-3203, now G. S. 1949, 60-3203).

The pleadings on which the cause was submitted to the jury can be summarized briefly. For the moment all that need be said respecting them is that the petition states a cause of action under the statute and alleges that plaintiff's intestate decedent, while in

charge of and operating a Chicago, Rock Island and Pacific Railway Company engine, was killed in a collision between a motor transport belonging to the defendant association and a passenger train belonging to the railway company at a railroad-highway crossing and that the negligence of such defendant, which was denied by its answer as well as that of the insurance company, was the proximate cause of the decedent's death.

Many factual allegations of the petition, not now important, were admitted by the defendants' answers. In addition each such defendant alleged in its answer that the deceased engineer's negligence in the operation of the train at a high and excessive rate of speed of at least 100 miles per hour, under conditions and circumstances which made it impossible for him to bring the train to a stop at the crossing when the occasion required, was the direct and proximate cause of his death. The answers also charged that such decedent assumed all risks attendant upon the operation of the train under existing circumstances and that plaintiff was estopped to deny the decedent was free from negligence by reason of the fact the railway company had confessed his negligence as well as its own by settling and disposing, without suit, of claims filed against it by other employees who were assisting in the operation of the train at the time of the accident. On motion of the plaintiff all allegations, except the admissions referred to in this paragraph of the opinion, were stricken from the answers by the trial court and the propriety of that ruling is one of the questions for appellate review.

With issues joined, as heretofore related, a jury was empaneled and sworn to try the cause. Thereupon plaintiff made her opening statement. At its close defendants moved for judgment on such statement. When this motion was overruled plaintiff adduced her evidence. After she had introduced all her evidence defendants demurred thereto. This demurrer was also overruled. Defendants then adduced their evidence. At the close of all the testimony they requested certain instructions which were denied. Thereafter, under instructions submitted by the court, the jury retired to the jury room and in due time returned a single verdict in favor of the plaintiff and against both defendants. Thereupon counsel for defendants requested that a separate verdict be returned against the defendant Casualty Company for the amount of its insurance coverage only. This request was granted and the jury, in

compliance with instructions of the court, returned two verdicts, one against the Casualty Company for the amount of its insurance coverage and the other against the Consumers Association for the full amount of damage found to be due. Thereafter the defendants filed motions for judgment notwithstanding the verdicts and motions for a new trial. When these motions were overruled they perfected this appeal.

The points relied upon by appellants as grounds for reversal of the judgment are succinctly set forth in their specifications of error which read:

"1. The District Court erred in sustaining Plaintiff's motion to strike portions of amended separate answers of the defendants Consumers Cooperative Association and American Fidelity and Casualty Co. Inc.

"2. The District Court erred in overruling defendants' motion for judgment in their favor on the opening statement of plaintiff's counsel.

"3. The District Court erred in overruling the defendants' demurrer to the evidence offered by the plaintiff for the reason that it failed to sustain any of the allegations of negligence contained in plaintiff's petition, for the further reason there was a complete failure of proof and for the further reason as set out in Defendants' demurrer to the evidence.

"4. The District Court erred in refusing to submit defendants' requested instructions to the jury and to fully instruct the jury thereby.

"5. The District Court erred in overruling defendants' motion for a new trial.

"6. The District Court erred in overruling defendants' motion for judgment not withstanding the verdict of the jury.

"7. The District Court erred in entering judgment for the plaintiff and against the defendants; for the reason that said judgment is wholly contrary to the law and evidence introduced in this action."

So far as the facts are concerned the vital issue involved in this case is whether those admitted by the answers, and others established by the evidence, are sufficient to warrant the trial court's action in submitting to the jury for its decision, as a question of fact, the question whether negligence on the part of the driver of the motor transport was the proximate or legal cause of the collision. Indeed, there is little, if any, dispute between the parties as to the factual situation on which a decision of such issue depends. On that account, without distinguishing between admissions and facts established by the evidence, the facts essential to a proper understanding of the conditions and circumstances prevailing at the time the accident occurred can be stated in narrative form as follows:

The train consisted of two Diesel engines and eleven modern-design light-weight passenger cars. Locomotives No. 637 and No. 634

comprised the power units. Number 637 was the lead unit and its cab was occupied by the plaintiff's decedent, who operated and controlled the engines drawing the train, as locomotive engineer.

The motor transport consisted of a motor unit and semitrailer tank which was loaded with approximately 3,000 gallons of gasoline and 1,300 gallons of distillate at the time of the accident.

The collision occurred at a point some seven miles southwest of Norton, Kan., where the railroad track runs east and west and state highway No. 383 north and south, the two crossing substantially at right angles. The train was going west and the motor transport south. The driver of the transport was familiar with the highway and crossing, having traveled the highway and crossed the railroad track on a number of previous occasions.

For a distance of approximately fifty feet in each direction the crossing was substantially at grade. A standard cross-buck sign bearing the words "Railroad Crossing" was located 27½ feet north of the track, a standard highway railroad crossing sign was located 794.7 feet north of such track and in between the two signs, at a point 604 feet north of the railroad track, was a narrow bridge crossing what is known as Prairie Dog Creek.

There is some discrepancy in the testimony but it is clear the accident took place between 3:30 a. m. and 4:30 a. m., probably about 3:45 a. m. on December 23, 1947. It was cloudy that morning but there was no fog and, except for the fact it was dark, visibility was good.

The front Diesel engine was equipped with a whistle which could be heard for several miles. It was also equipped with two headlights, one of which shone straight ahead and the other oscillated its rays from side to side somewhat similar to the upper part of a horizontal figure "8."

When the train left Norton both headlights on the front engine were shining and they continued to shine until the moment of the crash. The oscillating light was seen by persons at a point approximately ten miles west of the point of the collision. The whistle of the locomotive was blown and was heard by persons who happened to be awake at the early hour in question when the train was a considerable distance from the crossing. Witnesses also heard the regular crossing whistle followed by a long blast of the whistle which continued to the moment of the collision.

Evidence was also adduced, and not denied, to the effect that a

person standing on the crossing or on the highway at any point within 240 feet north of the crossing would have an unobstructed view of the train approaching from the east for a distance of approximately 2,000 feet, after it came around a curve some 2,000 feet east of the crossing; anyone standing on the crossing at night or on the highway immediately north of the track could see the direct headlight of the locomotive beginning at a point a mile east of the crossing and the glow of the oscillating light about the time the train left Norton; from the time the engine reached a point 1,941 feet east of the crossing and continuing until it reaches the crossing he can look directly into both headlights.

Just prior to the collision the train was in an eighty-five mile zone of the railroad line and it was traveling from sixty to sixty-five miles an hour. The brakes were applied somewhere between three to five seconds before the collision.

At the crossing the engine struck the tank section of the motor transport. Part of the tank was thrown to the north of the track and the other part to the south. The motor section of the transport was thrown to the south of the track and to the west a distance of about 120 or 125 feet from the intersection.

As the result of the collision, which was followed by instantaneous explosion and fire, the driver of the motor transport, the plaintiff's intestate decedent, the engineer, and the fireman who was sitting in the cab of the engine with him were killed. The body of the driver of the motor transport was found south of the track and to the west some twenty-five to thirty feet northeast of where the motor section of the transport came to rest. The bodies of the engineer and fireman were found in the cab of the engine and when found each was sitting in his seat in the cab leaning forward and outward. The throttle of the engine was in an idle position and the automatic brake valve was found in full emergency position.

After the collision no flares, reflectors, or other signals were found on either side of the railroad crossing on the highway.

All known eye witnesses to the collision were instantly killed and the evidence adduced at the trial came from the lips of witnesses who gave their version of the existing facts based on observation of the surrounding conditions and circumstances.

With respect to its first specification of error appellants raise three questions. The first is that the trial court should not have stricken allegations in the answers charging appellee's decedent

with negligence in operating the train. Resort to the pleadings in question makes it clear such allegations charged the engineer with operating the train at an excessive rate of speed, under conditions and circumstances where he was unable to bring it to a stop at the crossing when occasion required and nothing more. The settled law of this state is that railroads may lawfully operate their trains at any rate of speed their business may require outside the limits of municipalities and populous communities where no peculiar conditions exist which made it dangerous for them to do so, even though the rate of speed is so great as to make it impossible for their trains to stop at crossings, and that standing alone conduct of that character does not constitute actionable negligence. See *Bazzell v. Atchison, T. & S. F. Rly. Co.*, 134 Kan. 272, 5 P. 2d 804; *Bunton v. Railway Co.*, 100 Kan. 165, 163 Pac. 801; *Land v. Railroad Co.*, 95 Kan. 441, 148 Pac. 612; *Adams v. Railway Co.*, 93 Kan. 475, 144 Pac. 999; *Railway Co. v. Schriver*, 80 Kan. 540, 103 Pac. 994; *Railway Co. v. Durand*, 65 Kan. 380, 69 Pac. 356, and *A. T. & S. F. Rld. Co. v. Hague*, 54 Kan. 284, 38 Pac. 257. The foregoing rule applies with equal force to the engineer who was operating the train for and on behalf of the railroad. It follows the trial court did not err in striking the allegations to which we have last referred from the answers. The second question raised by this assignment of error is that allegations in the answers to the effect decedent assumed all risks attendant upon the operation of the train under the circumstances alleged in the petition were improperly stricken. The short answer to this question is that the doctrine of assumption of risk is only applicable to cases arising between master and servant (*LeClair v. Hubert*, 152 Kan. 706, 709, 107 P. 2d 703). If such allegations be construed as charging that the decedent, like the railroad, would be responsible for negligence in operating the train it is answered by our conclusion other allegations of the answers failed to establish negligence in that respect. There is little merit to the third contention the trial court erred in striking allegations from the answers charging that appellee was estopped from denying her intestate decedent was free from negligence because the railroad had confessed his negligence by compromising and paying claims, without suit, made by other employees upon the premise they had sustained injuries in the involved accident due to negligence of the railroad in operating the train. We are cited to no decisions, and are unable to find any, holding

that action of that character by an employer establishes negligence on the part of its employee.

Directing attention to specification of error No. 3 we come to what has been heretofore referred to as the all important issue involved in the case. The over-all position taken and strenuously urged by appellants on this point is that the trial court should not have submitted to the jury the question whether negligence on the part of the driver of the motor transport was the proximate or legal cause of the collision and that instead it should have sustained their demurrer to appellee's evidence on the ground she had wholly failed to establish the negligence of the driver of the transport as charged in the petition which, in a general way, can be said to be that such driver failed to stop the transport within fifty feet but not less than ten feet from the nearest rail of the railroad, failed to stop, look and listen for the approaching train or signals indicating its approach, and failed to wait at such crossing until he could proceed across it with safety, all as required by the provisions of G. S. 1947 Supp., 8-566 (now G. S. 1949, 8-566).

The general rule, so well established as to hardly require citation of our decisions supporting it, is that in ruling on a demurrer to the evidence the evidence and the inferences that may properly be drawn therefrom must be considered in the light most favorable to the party against whom the demurrer is directed, and if the evidence and the inferences viewed in that manner are of such character that reasonable men in the exercise of fair and impartial judgment may reach different conclusions, the demurrer should be overruled and the issue submitted to the jury (West's Kansas Digest, Negligence, § 136 [9] [10], Appeal & Error, § 927 [5], and Trial, § 156 [2] [3]).

It must be admitted, as appellants point out, the simple fact the collision occurred and some were killed or injured, standing alone, is not enough to establish negligence and that the record must disclose substantial competent evidence showing negligence on the part of the driver of the transport which was the proximate or legal cause of the collision in order to uphold the trial court's action in overruling the demurrer. These, and most of the other legal principles having application to the facts presented by the record in the instant case are fully set forth in *Hendren v. Snyder*, 143 Kan. 34, 53 P. 2d 472, and *Crowe v. Moore*, 144 Kan. 794, 62 P. 2d 846, where, in each such decisions, it is said:

"The simple fact that there was a collision and someone was injured is not of itself sufficient to predicate liability. (*Zinn v. Updegraff*, 113 Kan. 25, 35, 213 Pac. 816; 9 Blashfield Cyclopedia of Auto Law, 399.) It is familiar law that negligence is never presumed; it must be established by proof. Like any other fact, it may be established by circumstantial evidence. (*Mayes v. Kansas City Power and Light Co.*, 121 Kan. 648, 249 Pac. 599.) But the circumstances 'relied on must be of such a nature and so related one to the other that the only reasonable conclusion to be drawn therefrom is the theory sought to be established.' (*Cornwell v. O'Connor*, 134 Kan. 269, 271, 5 P. 2d 861.) 'A fact is not proven by circumstances which are merely consistent with its existence.' (*Canestro v. Joplin-Pittsburg Rld. Co.*, 135 Kan. 337, 341, 10 P. 2d 902.)

"In *Whiteker v. Wichita Rld. & Light Co.*, 125 Kan. 683, 265 Pac. 1103, it was held:

"'A finding of negligence cannot rest on mere conjecture, but must be established by competent proof.' (Syl. ¶ 1.)

"See, also, *Beeler v. Railway Co.*, 107 Kan. 522, 192 Pac. 741; *Norman v. Railway Co.*, 101 Kan. 678, 168 Pac. 830, and *A. T. & S. F. Rly. Co. v. Toops*, 281 U. S. 351, reversing *Toops v. Atchison T. & S. F. Rly. Co.*, 128 Kan. 189, 277 Pac. 57.*"

It is to be noted that statements of like, if not identical, import appear in our more recent decisions of *Miller v. Gabbert*, 154 Kan. 260, 266, 118 P. 2d 523, and *Goodloe v. Jo-Mar Dairies Co.*, 163 Kan. 611, 618, 185 P. 2d 158.

To the foregoing principles of law we might add another which is particularly applicable here. It is that the physical facts and circumstances of a collision may be sufficiently clear to warrant a trial court in submitting the questions of how the collision occurred and who was at fault to a jury for decision even in the absence of testimony of eye witnesses (*Sawhill v. Casualty Reciprocal Exchange*, 152 Kan. 735, 107 P. 2d 770).

We should perhaps pause at this point to mention two other legal principles which, under the prevailing facts, are equally as applicable as those heretofore mentioned and are stressed by appellants in arguments advanced in support of their positions on specifications of error numbered 5, 6 and 7, as well as the one now under consideration. The first of these principles is that it is not within the jury's province to indulge in mere speculation or conjecture in respect to an issue of negligence, hence a verdict cannot be predicated on mere speculation or conjecture respecting that vital issue (*Hendren v. Snyder*, supra, *Whiteker v. Wichita Rld. & Light Co.*, 125 Kan. 683, 265 Pac. 1103; *Helm v. Railway Co.*, 109 Kan. 48, 196 Pac. 426; *Beeler v. Railway Co.*, 107 Kan. 522, 192 Pac. 741;

*Hart v. Railroad Co.,* 80 Kan. 699, 102 Pac. 1101; *Railroad Co. v. Aderhold,* 58 Kan. 293, 49 Pac. 83). The second principle, to which we have last referred, is that ordinarily, and in the absence of convincing evidence to the contrary, it will be presumed that a deceased person exercised reasonable care for his own safety (*Henderson v. National Mutual Cas. Co.,* 164 Kan. 109, 187 P. 2d 508; *Smith v. Bassett,* 159 Kan. 128, 152 P. 2d 794; *Eidson v. Railway Co.,* 85 Kan. 329, 116 Pac. 485; *Railroad Co. v. Gallagher,* 68 Kan. 424, 75 Pac. 469; *C. R. I. & P. Rly. Co. v. Hinds,* 56 Kan. 758, 44 Pac. 993). This presumption, it is to be noted, is a rebuttable one and may be overcome by direct or circumstantial evidence sufficiently strong for that purpose (*Sawhill v. Casualty Reciprocal Exchange,* supra; *Goodloe v. Jo-Mar Dairies Co.,* supra).

Nothing will be gained by repeating the evidence before the trial court at the time of its ruling on the demurrer. It will suffice to say that when such evidence is surveyed and critically analyzed in the light of the principles of law, to which we have heretofore referred, we believe it discloses sufficient probative facts and circumstances immediately preceding, attending, and following the collision, to warrant that tribunal's action in overruling the demurrer to the evidence and in submitting to the jury for its decision, as the trier of facts, the question whether the driver of the motor transport was guilty of acts of negligence as charged in the petition which were the proximate and legal cause of the collision and the injuries sustained by the appellee's intestate decedent.

In reaching the conclusions just announced we have not failed to give careful consideration to two contentions upon which appellants place great weight and insist compel a contrary view. The essence of one is that the circumstantial evidence adduced by appellee was insufficient to overcome the presumption of love of life, the exercise of due care and compliance with law, with which the law itself clothed the driver of the motor transport at the time of the collision. The gist of the other is that the evidence was wholly insufficient to establish negligence on the part of such driver as charged in the petition and afforded the jury nothing but speculation and conjecture upon which to base a verdict on that vital question. In view of what has been heretofore stated all that need be said is that we have rejected both contentions because we are convinced appellants have failed to give the evidence the force and effect to which it is entitled.

Our decision respecting the sufficiency of the evidence and the

propriety of the trial court's ruling on the demurrer is not entirely new or unsupported by the authorities. In *Chicago, Rock Island and P. R. Co. v. Consumers Coop. Ass'n,* 180 Fed. 2d 900, wherein, except for the parties to the action and a counter-claim by the Consumers Cooperative Association, similar facts and issues were involved, the United States Court of Appeals, for the Tenth Circuit, reached a like decision which we believe should be followed and adhered to as a sound legal precedent.

Having determined the demurrer to the evidence was properly overruled appellants' second specification of error requires little attention. This court is committed to the rule that no judgment should be entered on an opening statement unless in the making of such statement it appears the party making it has admitted facts which necessarily and absolutely preclude recovery (*Wilson v. Holm,* 164 Kan. 229, 188 P. 2d 899; *Rodgers v. Crum,* 168 Kan. 668, 673, 215 P. 2d 190). No admissions of that character appear in the appellee's opening statement. Therefore, appellants' motion for judgment thereon was properly overruled.

The same holds true of the fourth specification of error. It suffices to say we have examined the instructions requested and denied, as well as those submitted by the trial court, and that we find nothing in either those denied or submitted which would warrant this court in reversing the judgment.

Other specifications of error not heretofore specifically referred to, and contentions advanced with respect thereto, relate to questions pertaining to the sufficiency of the evidence. Such questions require no further attention since they have been discussed, considered, and disposed of in the opinion.

The judgment is affirmed.

PARKER, J. (dissenting): My time is limited and I recognize that a dissenting opinion is of no value to the bench and bar as a precedent, hence my views will be stated very briefly.

In order to recover from the appellants the appellee had the burden of establishing negligence on the part of the driver of the motor transport. Since there were no eye witnesses to the collision she attempted to do so by evidence showing the physical facts and circumstances existing immediately prior to and after its occurrence. It is my view the most that can be said for the evidence, as set forth in the majority opinion, giving it the benefit of every inference to which it may be entitled under our decisions, is that it merely dis-

closes facts and circumstances consistent with appellee's theory the driver of the motor transport attempted to cross the crossing in front of the approaching train in violation of law and without exercising the degree of care thereby required. In my opinion, that evidence is not only insufficient to overcome the legal presumption of due care and observance of law with which the driver was clothed at the moment of the collision but fails to affirmatively establish that his negligence in the operation of the motor transport was the proximate and legal cause of the accident. Therefore I would reverse the judgment with directions to sustain the appellants' demurrer to appellee's evidence.

SMITH and WERTZ, JJ., join in the foregoing dissenting opinion.

WERTZ, J. (dissenting): I wish to supplement the foregoing dissenting opinion of Parker, J., in which I concur. Appellants predicate error on the lower court's action sustaining appellee's motion to strike the defense of contributory negligence and assumption of risk from appellants' answers. The appellants in their answers made certain admissions not material to this particular question involved, and in addition each appellant alleged in his answer the following:

"11. Further answering, this defendant states that plaintiff's decedent, Clarence C. Modlin, at the time described in her petition, was in charge of and operating the train described *and that said train was late and that the crossing described in plaintiff's petition is in an 85-mile an hour zone, that plaintiff's decedent was required by the rules and regulations of his employer to maintain a speed of not less than 85 miles an hour while going over said crossing, and that due to the fact that said train was late, plaintiff's decedent was operating said train at a speed greatly in excess of 85 miles an hour, to wit: at least 100 miles an hour;* that as said train approached said crossing it emerged from a curve some 1,900 feet to the northeast and from which point plaintiff's decedent first had a clear view of said crossing; *that with the train speed 85 miles an hour it could not be brought to a stop in less than 3,000 feet; that plaintiff's decedent carelessly and negligently and unlawfully operated said train at a greater speed than would permit him to bring said train to a stop within 'his assured clear distance ahead; that in keeping with the rules and requirements of said railroad he carelessly and negligently operated said train at the aforesaid high and excessive speed, and unable to bring said train to a stop at said crossing when occasion required,* and that the negligence of plaintiff's decedent in the foregoing respects directly caused or directly contributed to cause his death, and this defendant pleads said negligence of plaintiff's decedent in bar of her action."

Appellee filed a motion to strike the italicized portion of the afore-

mentioned answers, which motion was by the court sustained as a matter of law.

It is obvious that the appellants' answers set up the defense of contributory negligence on the part of the railroad engineer in the operation of his train at the time and place in question, and that the court in sustaining the motion to strike that defense denied the appellants the right to offer any proof on that issue.

Section 60-710, G. S. 1949, provides what an answer shall contain. Among other things, the defendant may set forth in his answer as many grounds of defense, counterclaim, setoff, or for relief as he may have whether they be such as have heretofore been denominated legal or equitable or both. We have stated many times, as will be disclosed by the cases cited under section 60-710, that a defendant has a right to form his pleadings so as to meet such conditions and contingencies of the case as his opponent might possibly attempt to prove. (*Funkhouser Equipment Co. v. Carroll*, 161 Kan. 428, 168 P. 2d 918; *Kennedy v. Monroe*, 165 Kan. 168, 173, 193 P. 2d 220.) When the lower court struck the matters of defense from appellants' answers, it denied them the right to show any acts or circumstances on the part of the engineer in the operation of the train at the time and place in question which might be considered negligence barring his widow's recovery.

It may be noted that no motion was filed by appellee requiring appellants to make their answers more definite and certain. Kansas long ago adopted the statutory rule of liberal construction of pleadings. G. S. 1949, 60-736 reads:

"In the construction of any pleading, for the purpose of determining its effect, its allegations shall be liberally construed with a view to substantial justice between the parties."

See also *Campbell v. Kansas Power & Light Co.*, 165 Kan. 134, 193 P. 2d 177; *Owens v. Deutch*, 156 Kan. 779, 137 P. 2d 181, and cases therein cited, pp. 783-4. In construing the above statute, this court has repeatedly held that where a demurrer is filed to a pleading or motion to strike a pleading on the ground that it does not state a cause of action or defense without first presenting a motion to have the allegations of the pleading made more definite and certain, the allegations of such pleading will be liberally construed in favor of the pleader.

I am unable to agree with the lower court in sustaining a motion to strike the defense as set forth in appellants' answers as a

matter of law; to do so in my opinion grants the right to a railroad company to operate its trains outside the cities of this state at any speed it so desires under any and all circumstances and holds that such excessive speed does not constitute negligence on the part of the railroad or its engineer and agents. As early as *A. T. & S. F. Rld. Co. v. Hague*, 54 Kan. 284, 38 Pac. 257, this court held that while railroad companies may move their trains at such rates of speed as the character of their machinery and roadbeds may make practicable, they must not forget that increased speed for the train means increased danger to those who must cross the tracks and that increased care on their part to guard against accidents becomes a duty. And again in the case of *Schaefer v. Interurban Railway Co.*, 104 Kan. 394, 179 Pac. 323, this court reiterated that while high speed alone is not negligence, it may be and should be considered in connection with all other circumstances such as the physical condition of the crossing and the topography of the immediate vicinity in determining whether the railway company was exercising due care in operating its train, and that such due care or want of it depends to some extent upon the speed at which the train approached the crossing.

It adds nothing to the annals of law, in a dissenting opinion, to exhaust the opinions of the courts of many states holding that speed of a train alone—in the absence of statute or regulation restricting the speed of trains at the place of the accident—is not negligence, but that speed considered with other circumstances may constitute negligence.

I realize this is an age of speed and that it is necessary for railroads to operate their trains at a speed in keeping with the age. By the same token, thousands of miles of high-speed highway have been developed in this country for the purpose of moving traffic, and this was done in keeping with the age. Over these highways thousands of buses carrying helpless school children travel daily crossing railroad tracks which intersect such highways, and thousands of people are being carried by buses as passengers for hire crossing the railroad tracks, and they, too, have some rights. To hold as a matter of law that it is not negligence for a railroad train to operate its locomotive over such highways at a speed of 85 to 100 miles per hour, and under other conditions set forth in the portion of the answer stricken, grants to railroad companies special privileges and rights such as have not been granted to any other person or corporation within our state, and it would appear to me

that it denies those using the public highways an equal protection of the law, and leaves any party injured on such crossing without a remedy.

If the majority opinion as I construe it follows the rule of *stare decisis* in this state, then I am of the opinion that such rule is antiquated and should be changed. This is an age of progress in all phases of our lives, and the law cannot stand alone as resistant to the change about us; it must keep step in this forward progress. Wherever conditions and circumstances make it necessary to modify or change the law in order that equity be done, the law of old cases must give way to the progress of the times even as it must in industry, in science, and other fields. In the language of *Dwy v. Connecticut Co.*, 89 Conn. 74, 92 Atl. 883 at page 99:

"That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and should not be stationary."

I am of the opinion that the judgment of the lower court should be reversed and a new trial granted with instructions to reinstate the stricken portion of appellants' answers.

SMITH, J., joins in the foregoing dissenting opinion.

WEDELL, J. (concurring): I concur in the decision of the majority and have no criticism of the majority opinion as written. The author, of course, states the facts with entire fairness. I do, however, prefer to state my own reasons for the conclusions I draw from those facts. As I view this record the district court clearly would have committed reversible error had it sustained defendants' demurrer and deprived the jury of its right to determine whether the driver of the gasoline transport truck was guilty of negligence.

Here two vital witnesses, in a most unfortunate accident, lost their lives. One was the engineer of the train, plaintiff's husband. The other was the operator of defendants' transport gasoline truck. No eye witness to the accident testified. The legal presumption was that each of the deceased persons exercised due care for the preservation of his own life. Of course, that presumption prevailed until rebutted.

I agree the burden rested on plaintiff to introduce evidence to rebut the presumption as applied to the driver of the defendant gasoline transport. Without attempting to narrate all the pertinent facts, stated in the majority opinion, I observe defendants' answer admitted its driver had a clear and unobstructed view of the train for a distance of 1,900 feet. That is more than one-third of a mile. In contemplation of law he saw what he could, and should have seen. Yet he attempted to negotiate this crossing with a heavy load of highly inflammable liquids immediately in front of the approaching train, which defendants state was coming at a high rate of speed. I shall not pursue the matter with a consideration of other pertinent inferences of negligence which, on demurrer, must be resolved in the widow's favor.

In my opinion the record amply discloses the question of the negligence of the driver of defendants' truck was certainly one over which *reasonable minds at least might differ.* That being true defendants' demurrer to plaintiff's evidence was properly overruled. The foregoing is precisely what the tenth circuit court of appeals also held in *Chicago, Rock Island & P. R. Co. v. Consumers Coop. Ass'n,* 180 F. 2d 900. There this very question was thoroughly considered on the identical record used in the instant case, the only difference in the cases being that in the federal case the Chicago, Rock Island and Pacific Railroad Company, and others, were plaintiffs.

I need not quote the pertinent portions of that opinion or its headnotes but attention is especially directed to the latter as they concisely cover material facts and issues in the instant case. They accurately cover the ordinary rule that a deceased person is presumed to have exercised due care for his own safety, that the presumption may be rebutted by specific facts or circumstances and that the facts and circumstances in the case were sufficient to rebut the presumption of the defendant driver's care and to require the case to be submitted to the jury, the reason being that reasonable men could draw different conclusions therefrom. In my view that conclusion was inescapable in that case and is likewise unanswerable in the instant case. That reasonable jurors might draw different conclusions from the evidence seems to me to be rather conclusively established when members of the federal court and of this court themselves draw different conclusions therefrom.

Of what legal significance, in the instant case, is the question

whether G. S. 1949, 8-566 is a fair, a wise or an unwise, law? I can conceive of none. No question was raised concerning the constitutionality of that statute which requires the drivers of certain vehicles, like the one operated by the driver for the Consumers Cooperative Association, to stop at a railroad crossing such as the instant one, in wide open country, to listen and look and not to proceed until they can do so with safety. No question whatever was, or is now, presented whether the statute constitutes unjust discrimination against other vehicles transporting persons for hire, or otherwise. Courts are limited in their decisions to rule upon issues joined by the parties. Appellate courts do not reach out and rule on issues not presented to a trial court. Much less do they reverse decisions thereon.

It is difficult to believe anyone would seriously question the fairness or the wisdom of a law which requires motor vehicles carrying passengers for hire, or a bus carrying school children, or a vehicle carrying explosives or inflammable liquids to comply with the requirements of a law such as G. S. 1949, 8-566. In any event whether such an enactment is progressive or reactionary, wise or unwise, as a reasonable means of best protecting all concerned in the use of public highways is a matter which rests solely in the province and judgment of the legislature. The duty of courts is not to arbitrarily nullify the legislative will or to question the wisdom of legislative policy. It is elementary that their duty, in those respects, is to ascertain the legislative will and to make it effective if reasonably possible to do so. (*State, ex rel., v. Russell*, 171 Kan. 709, 237 P. 2d 363, and various cases therein cited.)

Did it constitute reversible error to strike portions of defendants' answer? Manifestly, pertinent and material allegations of any pleading should not be stricken. The code, however, expressly authorizes the striking of redundant or irrelevant matter on motion of the party prejudiced thereby (G. S. 1949, 60-741) and failure to bring such matter to the attention of the court before pleading thereto constitutes a waiver thereof. (*Sheldon v. Board of Education*, 134 Kan. 135, 4 P. 2d 430.)

I shall not deal in generalities in discussing this subject but with the allegations of this particular answer. It plainly concedes there was no near obstruction to the view of the approaching train. It admits this train, in open country, was plainly in view for a distance of 1,900 feet, more than one third of a mile. *Under these circum-*

*stances* was the engineer obliged to reduce the speed of the train before negotiating the curve so as to be able to stop at the crossing in the event someone might attempt to drive over it in front of the approaching train? I do not think so.

Without reviewing our numerous decisions on the subject it is sufficient to say the part of the answer stricken, when fairly examined, discloses it did not allege peculiar facts and circumstances which made speed of the train, *in a wide open country,* a proper charge of negligence on the part of the engineer. The trial court properly struck that part of the answer. That order likewise was in harmony with the Kansas law as announced in *Chicago, Rock Island & P. R. Co. v. Consumers Coop. Ass'n,* supra, which was decided in 1950, prior to the order here involved. Although the allegations of defendants' answer were not there involved the substantive law on the subject of speed of a train in open country was clearly and accurately stated. The opinion treats the subject fully and well. The substance thereof reads:

"No statute or effective regulation has been called to our attention limiting the speed at which trains may be operated in Kansas outside the limits of municipalities. And it is the settled law in that state that a high rate of speed of a train in an open country where no peculiar conditions exist which make it dangerous, standing alone and without more, does not constitute negligence." (p. 905, 906.)

Numerous supporting Kansas decisions are cited in the opinion. It is sufficient to direct attention to the facts and circumstances involved in the cited cases. In one of our rather recent cases (*Ross v. Chicago, R. I. & P. Rly. Co.,* 165 Kan. 279, 194 P. 2d 491), based on a long established rule in this state and the prevailing doctrine elsewhere, we quoted with approval from 44 Am. Jur., Railroads, §§ 487, 495, as follows:

" 'The mere fact that the engineer sees a person on or dangerously near a railway track in front of his moving train does not require him to endeavor to stop the train, for he has a right to assume, in the absence of anything to indicate otherwise, that such person will get out of his dangerous position in time to avoid a collision and injury, and the doctrine of last clear chance is not called into operation.'

" 'But while the relative rights and obligations of a railroad company and travelers on the highway are reciprocal, it is the privilege of the railroad company that its trains shall have the right of way, and that all persons on the highway shall yield precedence to the trains. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching traveler to make the crossing first; the traveler must yield the use of the rail-

road track to an approaching train, and the conduct of the train crew may be lawfully predicated upon the expectation that travelers will observe their duty in this regard.'" (p. 287.)

Probably the most severe mental hazard and nervous strain on railway trainmen is that caused by operators of motor vehicles who approach crossings at a high rate of speed and suddenly apply their brakes and stop just before reaching a crossing or by those who attempt to cross immediately in front of a closely approaching train. It indeed would be a shocking decision to railway trainmen everywhere to learn that, if in the faithful performance of their duty in accordance with established railroad law on which they had a right to rely they lost their lives, their widows and children could recover nothing for their loss.

The failure to limit speed of a train, in open country, was not occasioned by a regard for railroad companies but was the result of an early public demand for speedy and expeditious train operations at the hands of railroad companies. (*Bunton v. Railway Co.*, 100 Kan. 165, 169, 163 Pac. 801.)

Indeed the supreme court of the United States has declared unconstitutional an act of the legislature of Georgia which sought to compel a railroad engineer to begin to check the speed of his train when 400 yards from each public road crossing at grade and to keep checking the speed so as to stop in time should any person or thing be crossing the track on the road. The act as applied to all crossings was declared to be a direct burden on interstate commerce when applied to an interstate passenger train and beyond the power of a state to enact. (*Seaboard Air Line Ry. v. Blackwell*, 244 U. S. 310, 315, 61 L. ed. 1160, 37 S. Ct. 640.)

That decision is quite understandable when one considers the practical problems of slowing up or stopping the momentum of long trains at every railroad crossing in open country in comparison with the ease of stopping a motor vehicle. Any other law would be practically destructive of the successful operation of interstate passenger trains as demanded by the public and under control of the interstate commerce commission.

The endless delays in railroad transportation occasioned by a law such as the one declared invalid in Georgia are readily apparent when one realizes the public records of our state highway commission disclose we have thousands of railroad crossings at grade in this state alone. I shall not labor the subject. It readily is admitted, as in the United States supreme court case, *supra,* that

there are peculiar conditions and circumstances under which speed may constitute negligence. However, the allegations stricken from the instant answer did not allege such peculiar conditions and circumstances as made speed actionable negligence. The district court had a proper conception of the law and its rulings should be affirmed.

PRICE, J., joins in the foregoing concurring opinion.

SMITH, J. (dissenting): I find myself unable to concur in the opinion of the majority. It is the culmination of long growing dissatisfaction with the holdings of appellate courts generally in cases involving collisions at grade crossings. I have a profound conviction that the law of torts is based on not only the fundamental concept that a man should be reimbursed for the loss his neighbor's negligence has caused him, but that society as a whole has an interest in bringing about a lessening of the economic loss following negligence.

With the advance of civilization tremendous forces have been created—the steam engine, the automobile, the high-tension lines carrying electric power around the country, and other similar agencies. These forces are, in the main, when properly and carefully controlled, essential to mankind. When on the other hand, they are not controlled or escape from control or are negligently managed or operated, they become destructive and a menace. The point is, courts should regard the law of torts as a means of bringing about care in the handling and direction of these forces as well as the means of reimbursing the individual who suffers loss. It is a sad commentary on human nature, but true, when one becomes convinced that his negligence in handling these forces will be followed by pecuniary loss, he is more apt to exercise care in their management. Indeed fear of pecuniary loss through negligence is the only thing that enables man to exist in close contact with these forces.

As a matter of fact, the real concept of the law of torts was punitive to the tortfeasor rather than reimbursement to the injured one.

In this field as far as railway crossing accidents are concerned generally, the courts of the land have been remiss. It all came about through the development of the law of contributory negligence as applied to grade crossing cases. It is true this case is one where the driver of the engine on the rails is suing the user of the highway. The principle is the same, however. Through the years

the courts have developed the law of contributory negligence far beyond what in my opinion the welfare of our people demand. The "old stop, look and listen before venturing from a place of safety to one of danger" rule was developed in the days of the slow coal-burning engine, with steam coming out, puffing smoke and traveling thirty-five or forty miles an hour, and with horse-drawn traffic on the highways. The tempo of life was altogether different from that of today. It would have been a negligent observer indeed who could not detect an oncoming, smoke-belching steam locomotive in time to, in the exercise of the care possessed by the mythical, ordinary, reasonable man, have stopped his team so as to avoid a collision. Having stopped, it would be strange indeed if a traveler on the highway could not have detected such an engine coming toward him upon the rails before proceeding.

Another picture altogether is presented by the streamliner of the modern age. Now instead of the smoking, bell-ringing steam locomotive going at a comparatively slow pace, we have a comparatively silent Diesel drawn train hurtling through the countryside, frequently at the speed of over 100 miles an hour. During the silent hours of the night these monsters of steel hurl themselves through villages, hamlets and towns and past grade crossings where the ordinary commerce of the people is carried on by means of trucks, buses and other gas-propelled engines. Man has not himself changed as rapidly as has his means of transportation. He is handicapped by the same reaction time, has the same means of observation and the same habits of thought as did his father of a generation ago.

To hold to the same rule as to care that should be observed by the traveler on the highway at this date in comparison as was held to a generation ago is to forget or refuse to take cognizance of this change in the operation of railroad transportation and traffic on the highways.

The railroads excuse their increased speed by pointing out that it is demanded by the people whom they serve, that is, the public.

I do not gainsay that. What I do say is that the rule as to the liability of a railroad on account of negligence at grade crossings is such that the railroad companies have increased the speed without taking the steps they could take to provide safety devices at railroad crossings. The result is forty-one of our people in Kansas were killed in 1950 at grade crossings and fifty-three in 1951. If we knew some vile disease was going to take fifty-one of our people

in 1952 by death, there would be a general outcry to do something to prevent that tragic occurrence, yet we know that in the nature of things more than fifty-one people will be killed at grade crossings in 1952 and nothing to prevent it will be done.

When the opinion of the majority is once printed in our reports and becomes the law of the land, it will be a letter of marque to the railroads that they can proceed to kill that many or more and the courts can do nothing about it. I do not believe the courts should concede they are so helpless. As long as the railroads rest assured that the killing of one of our citizens at a grade crossing will not cost them through being held liable for the tragic event, they will not take any steps to provide safety devices. Such is human nature. Hence my statement at the outset of this dissenting opinion that my inability to concur in the majority opinion is the culmination of a long dissatisfaction with the holdings of courts generally with reference to grade crossing tragedies.

In order to reverse this judgment we will not have to change any rules of law.

These cases are well collected in the prevailing opinion. The rule has been stated in a number of ways. For instance, the simple fact that there was a collision and someone was injured is not in itself sufficient to predicate liability. Negligence like any other fact may be established by circumstantial evidence. The circumstances, however, relied on must be of such a nature and so related one to the other that the only reasonable conclusion to be drawn therefrom is the theory sought to be established. The fact is not proved by circumstances which are merely consistent with its existence. The finding of negligence cannot rest on mere conjecture but must be established by competent proof. Statements such as the above run through all of our reports and they are referred to in the prevailing opinion.

I am familiar, too, with the rule that in consideration of a demurrer to the evidence we must believe all of the evidence introduced by the plaintiff, indulge every reasonable inference that can be drawn therefrom in favor of the plaintiff and where reasonable men might differ, the question becomes one for the jury.

I differ from the application of these rules of law to the facts in this case. The prevailing opinion and the specially concurring opinion simply state that since the train came around a curve 1,900 feet away from the grade crossing the only reasonable conclusion is that the driver of defendant's truck must have driven upon the track

without looking to see whether there was a train coming or that he violated the statute and did not stop before venturing upon the track.

In my opinion this is hardly a reasonable conclusion. It entirely overlooks the presumption that men to preserve their own lives would not deliberately drive in front of an oncoming streamline train. I dislike the calculation in seconds of what men did in times of stress. It is said "in contemplation of law he saw what he could and should have seen. Yet he attempted to negotiate this crossing with a heavy load of highly inflammable liquids immediately in front of the approaching train which the defendants state was coming at a high rate of speed."

This is a categorical statement and will not stand the application to it of the rule of reasonableness. To me it is utterly unreasonable. It is just as reasonable to me to assume that the driver of the truck started to cross the tracks long before the train had rounded the curve; that something happened to his engine and it was stalled upon the tracks or that he saw the tracks clear and started up his engine; that he came to a stop and proceeded to cross. To hold otherwise is to utterly ignore the element of reaction time which every person who drives an automobile or rides in one knows is the prime factor in automobile collision cases. The holding of the majority actually convicts the driver of the truck of committing suicide. I do not believe the facts warrant any such conviction.

These same facts were passed on in *Chicago, Rock Island & P. R. Co. v. Consumers Coop. Ass'n*, 180 Fed. 2d 900. That was an action brought in the federal court by this plaintiff's husband's employer against the same defendants. The trial judge held against liability. In the opinion, just as in our majority opinion, the many cases involving proof of negligence were reviewed. That case finally turned on the statement by the court that all of the facts and circumstances established probative facts from which the jury in the exercise of fair and impartial justice could reasonably draw the deduction that the driver of the truck did not stop, look and listen or that he knew the train was approaching but ventured upon the track when the exercise of ordinary care required him to wait until it passed.

I have read this record carefully and I cannot see how in the world a court could make such a statement. To me it is utterly ridiculous. There were no eye witnesses and the physical facts are

as persuasive to me that the train came much faster than anybody had any idea it would come and thus hit the driver of the truck or that his truck stalled upon the tracks. At the most, the facts are merely consistent with the plaintiff's theory. This judgment is based upon conjecture.

I am much more impressed with the dissenting opinion of Judge Huxman in which he points out that the conclusion stated is altogether an unreasonable one. It is said that where four justices of this court conclude that the finding of the jury is reasonable and two judges of the circuit court of appeals think so, then it surely cannot be said that the minds of reasonable men would not reach such a conclusion. That statement overlooks the fact that a justice is charged with the duty of reaching a conclusion in his own mind and conscience as to a law point presented on an appeal.

I thus far have spoken only of the holding of the trial court overruling defendant's demurrer to the evidence. The ruling striking out the allegations of contributory negligence in the answer is purely indefensible, in my opinion. For the first time as far as I know it will be printed in our books that not only is it difficult to prove a railroad's negligence at a grade crossing, but now it is impossible to plead it.

For all these reasons, I dissent.

WERTZ, J., joins in the foregoing dissent.