CHICAGO, ROCK ISLAND AND PACIF-
IC RAILROAD COMPANY, a cor-
poration, Appellant,

v.

HUGH BREEDING, Inc., a corporation,
Appellee.

HUGH BREEDING, Inc., a corporation,
Cross-Appellant,

v.

CHICAGO, ROCK ISLAND AND PACIF-
IC RAILROAD COMPANY, a corpo-
ration, Cross-Appellee.

Nos. 5503, 5504.

United States Court of Appeals
Tenth Circuit.

July 19, 1957.

Rehearing Denied Aug. 21, 1957.

See also, 10 Cir., 232 F.2d 584.

John A. Johnson and Robert E. Shelton, Oklahoma City, Okl. (Savage, Gibson & Benefield, Oklahoma City, Okl., on the brief), for appellant and cross-appellee.

Gus Rinehart, Oklahoma City, Okl. (Butler, Rinehart & Morrison, Oklahoma City, Okl., on the brief), for appellee and cross-appellant.

Before PHILLIPS, PICKETT and LEWIS, Circuit Judges.

PHILLIPS, Circuit Judge.

Hugh Breeding, Inc.[1] brought this action against Chicago, Rock Island and Pacific Railroad Company, a corporation,[2] and the Railroad Company filed a cross-complaint against Breeding, each claiming damages as a result of a collision between a diesel-powered freight train of the Railroad Company and a motor-driven gasoline transport truck of Breeding. The collision occurred at a point where Wichita's extended 37th Street intersects the main line of the Railroad Company, approximately two and one-half miles northeast of the city limits of Wichita, Kansas. At that point 37th Street is an asphalt-topped country road running east and west, the asphalt topping being 20 feet in width. At such crossing the tracks of the Railroad Company intersect the road at an angle in excess of 90°. The crossing is a grade crossing and is located 8,805 feet northeast of the Railroad Company's Kline Station.

The truck was in charge of Breeding's driver, Gainer. It was a 1947 Inter-

---

1. Hereinafter called Breeding.

2. Hereinafter called the Railroad Company.

national semi-trailer gasoline transport truck, with a 36-foot trailer attached. The entire length of the unit was 49 feet, 1 inch.

At about 10:00 a. m., December 21, 1953, Gainer left Tulsa, Oklahoma, driving a transport truck loaded with gasoline for delivery at a Texas Company station in Wichita, Kansas. From 2:00 p. m. of that day, until he reached Wichita, he drove in snow. He did not put on chains, which he carried. He encountered no sliding difficulties en route on the paved highway. There was no evidence he had gone off the paved surface at any time prior to reaching the crossing. He unloaded the gasoline in Wichita, Kansas, about 5:30 p. m. Thereupon he went to the Phillips Petroleum Company, where he loaded his truck with gasoline to be delivered to an air line company at Tulsa, Oklahoma. He did not put on the chains while his trailer was being loaded, although the snow was two to three inches deep and there was ice under the snow. He intended to proceed to the east side of Wichita to spend the night with his brother. He stopped for a stop sign near the south exit of a service road leading from the Phillips loading dock to 37th Street. He then made a left-hand turn to the east, toward the railroad crossing and stopped for the crossing. Most of the turnout of the service road onto the crossing is on railroad right of way, including all of a metal guard rail to the northeast, painted white, next to which the dirt shoulder of the road drops off into a small ditch. He proceeded to a point where the drive wheels of the tractor were in the center between the railroad rails, at which point the unit became immobilized. The tractor was then pointed east, or southeast, on 37th Street and the trailer was angled northwesterly. The rear wheels of the tractor were just to the south of the metal railing.

Estimates of witnesses of the projection of the east rail of the track above the planking between rails in dry weather varied from three-fourths inch

to two inches. Witnesses testified that the crossing was in "reasonably good condition," "rough" but "average," "ordinary" and "rather rough." Gainer testified he did not know why the unit became immobilized. He said the drive wheels were slipping, although in the center between the rails. He testified that the truck just wouldn't move. He told Floyd Schroeder, Sheriff of Sedgwick County, Kansas, the night of the accident that the trailer wheels went into a ditch and he was stuck across the railroad track and could not move. At the trial Gainer admitted making that statement to Schroeder.

The diesel-powered train of the Railroad Company was No. 93, an unscheduled freight. It was composed of 88 cars, 62 of which were loaded and 26 empty, and was approximately three-fourths of a mile in length. It had an aggregate weight of 4,585 tons. It was slowing when it topped a rise 3,800 feet northeast of the crossing. The collision occurred at 7:45 p. m. The freight left Herington, Kansas at 4:50 p. m. and on reaching the 37th Street crossing had traveled 67.4 miles from Herington, at an average speed of 32.8 miles per hour.

According to the testimony of Gainer, the transport truck remained on the crossing for a period of 6 to 15 minutes before the collision. Gainer did not endeavor to disconnect the tractor from the trailer by removing the king pin and permitting it to rest on a fifth wheel. There was evidence that it could have been readily disconnected under ordinary conditions, but there was no proof that it could have been done under existing conditions. Gainer had three red electric reflectors, sufficient to reflect lights for not less than 1,000 feet. He did not put out the reflectors, either to warn travelers approaching the crossing or trains of the Railroad Company approaching the crossing, although it had been dark since 5:30 p. m. After failing in an attempt to back the truck off of the crossing, Gainer went to the first of seven Phillips houses located east of the track and north of 37th Street, where

lights were on, including the east porch light, and where a PBX operator was on duty. He knocked and called out at the first house, but was unable to arouse any one. He did not go to the fourth house, where the lights were on and where Thomas Thurman lived, was at home and had a telephone. He then returned to the crossing and made further efforts to move the transport truck forward or back, without success. He then got out a light and flagged motorist Clarence Benjamine, who was approaching from the west, and asked him to go to the Phillips plant and warn the Railroad Company by telephone. After Benjamine left, Gainer again tried to move the unit, but failed. Benjamine drove to the Phillips dock, where loader O'Brien was putting gasoline in a truck of Gilbert Weaver, and asked O'Brien to notify the Railroad Company. O'Brien did not do so. Weaver suggested that when his truck was loaded he might be able to pull the stalled transport truck off the crossing. O'Brien then saw the engine headlights and heard the whistle of the train, which was then approximately a mile away. He ran to the garage for a flashlight, picked up another flashlight in his car, and ran toward a gate in the east fence adjacent to the tracks. The gate is 300 feet from the loading rack and 1,083 feet from the crossing. The distance from the crossing, down the tracks to a point opposite the gate, is 1,094 feet, 6 inches. As O'Brien went through the gate, he looked at the intersection and could see the red clearance lights of the truck. Meanwhile, Weaver had run up the track between the rails ahead of him, waving his hat and arms, for a distance of 75 feet from a point opposite the gate to the point where the train reached him. The engineer did not see Weaver, but the fireman did. O'Brien went down the west side of the tracks about 50 feet and waited until he thought the engineer was close enough to see his flashlights and then began blinking them. The engineer saw the flashing or reflection of the lights out of the corner of his eye, coming from the bank on the right, about even with his head, on top of the cut, and while he was looking straight ahead and he almost immediately saw the image of the truck, as did the fireman and brakeman, who instantly warned him. He cut the throttle and applied full emergency air to the brakes. The train was equipped with a Westinghouse AB air brake system and the braking power on the train was normal. The train's speed had been reduced upon leaving Peabody, Kansas; and particularly, from a point five miles north of Wichita, at Kechi, as it climbed the grade which crests 3,800 feet northeast of the crossing, the speed had been reduced five or six miles per hour. At the time of the emergency application the brake valve was in first position, drawing off six to ten pounds of air, which dropped the brake shoes on the wheels, creating friction thereon, preparatory to the Kline station stop. From the crest of the rise to the crossing, a distance of 3,800 feet, there was a substantial down grade. At the time the brakes were first applied, 75 per cent of the train was traveling down grade, and at the time the brakes became fully effective, 85 per cent of the train was traveling down grade. Weaver was unable to estimate the speed of the train. Neither was Hicks, who was parked 50 feet west of the transport truck. O'Brien estimated the speed to be 45 to 50 miles per hour, but admitted he could not make an accurate estimate.

Clarence Benjamine testified:

"Q. Will you tell the jury, in your judgment, from where you were seated and what you saw there, how fast that train was traveling as it came past you, and immediately before the impact? A. Well, that would be a hard thing for me to say.

"Q. What is your best judgment on it? A. I would estimate it— I would say that it was going more than fifty miles an hour.

"Q. That is your judgment about what you saw there that night? A. Yes, sir."

McGann, a witness for the Railroad Company and a maintenance engineer of the Westinghouse Air Brake Company, testified upon a consideration of all the relevant factors, including the length and weight of the train and the down grade, that it would take about ten seconds, since the brake shoes were in contact, for the air to go throughout the length of the train and bring about full application and that if the train was traveling 30 miles per hour it could have been stopped in 1,600 feet; 35 miles per hour, 2,100 feet; 40 miles per hour, 2,600 feet; 45 miles per hour, 3,300 feet; 50 miles per hour, 4,100 feet; and 60 miles per hour, 5,800 feet.

W. K. Walker, a consulting engineer, testified:

"Q. At forty miles an hour, assuming the train was traveling at forty miles an hour in what distance in feet can that train be stopped if the brakes are working properly? A. 695 feet.

"Q. At fifty miles an hour how many feet will it take to stop that train, if the brakes are working properly? A. 986 feet.

"Q. At sixty miles an hour, how many feet will it take to stop that train with that weight, those cars, and if the brakes are working normally? A. 1,345 feet."

However, Walker based his testimony on a mathematical formula furnished him by another railroad company. It was a secret formula and he had no personal knowledge of its accuracy. He refused to furnish counsel for the Railroad Company with a copy of the formula and they had no opportunity to cross-examine him with respect to its accuracy. He did not take into consideration the reaction time for setting the brakes and he did not take into consideration that a substantial portion of the train was traveling down grade.

O'Brien thought the engineer had not seen his blinking signal and saw no sparks flying from the wheels and heard no noise coming from the brakes to in-

dicate their application. However, it would have taken at least five seconds in a train of this length for the brakes to take hold and ten additional seconds for a full application, and when O'Brien concluded the engineer had not seen his signals, he started back to his office to notify the Railroad Company's superintendent.

The evidence was in conflict as to whether it had ceased snowing at the time the train approached the crossing. However, it was clearly established that there was blowing snow, creating a ground blizzard. The seat in the cab of the diesel was seven feet above the ground. The top of the truck was 7 feet 11 inches above the ground. The visibility immediately above the tracks was very poor. At and above the seven foot level it was considerably better. The engineer testified that he could not see more than 500 or 600 feet "down low." However, as the train approached the crossing, the train crew were able to see the outline of the truck on the crossing from a distance of at least 1,000 feet.

An aerial photograph of the crossing and the adjacent area clearly established that the crossing was located in open country. It was in a farming area and in addition to the group of Phillips houses, there were only a few scattered houses. Neither was the crossing in a heavily traveled area. Only four vehicles, including the Breeding truck, approached the crossing on the highway during the 6 to 15 minutes the truck was stalled on the crossing.

█ The evidence wholly failed to establish that the condition of the planking on the crossing caused the truck to stall, or in anywise contributed to the accident.

In its complaint Breeding alleged that at the time and place of the accident the train was being operated at a high and dangerous rate of speed, under the circumstances, and in excess of 40 miles per hour; that visibility was bad, and that the trainmen failed to heed warn-

ings of persons who were attempting to stop or retard the train prior to its reaching the crossing.

At the trial Breeding amended its complaint by alleging that the crossing was negligently maintained and was defective and that the Railroad Company had the last clear chance to prevent the collision.

In its amended cross-complaint the Railroad Company alleged negligence on the part of Breeding, to wit: improper driving by Gainer; obstructing the crossing; failing to give warning to the Railroad Company of the obstruction; failure to operate the motor vehicle with chains.

The amount of damages to the transport truck was stipulated and the amount of damages to the train was stipulated.

The court instructed the jury in part as follows:

"The Railroad Company had the duty to maintain its crossing at 37th Street in a reasonably safe condition, this included its right-of-way immediately adjacent to such crossing.

"It was the duty of the Railroad Company, through its agents and train crew to take into consideration the condition of the weather, the visibility, the size, weight and length of the train, the fact that the train was approaching a populated city and all other conditions then prevailing, and to use ordinary care in the operation of said train in order to avoid accidents. A failure to discharge such duty would be negligence."

The court also gave an instruction on last clear chance, which, under the facts, did not fully accord with the rules laid down with respect to that doctrine by the Supreme Court of Kansas. Breeding took no exception to that instruction.

The court refused the following instruction requested by the Railroad Company:

"You are instructed that under the law, a railroad company is not required to operate its trains so that it can stop within the assured clear distance ahead or the assured clear distance of its headlights ahead."

At the close of the evidence the Railroad Company made a motion to dismiss the complaint and Breeding made a motion for a directed verdict. Both motions were denied.

At the trial the jury returned a verdict in favor of the Railroad Company on the complaint and in favor of Breeding on the cross-complaint.

Motions for a new trial were interposed by both parties. The plaintiff also moved for judgment notwithstanding the verdict. These motions were denied. Both parties have appealed.

## I.

### The Railroad Company's Appeal.

This is a second appeal in the instant case. On the former appeal this court reversed a summary judgment in favor of Breeding.[3] In the opinion in that case we, in part, said:

"It is generally held and certainly that is the established law of Kansas that a high rate of speed in the open country does not in and of itself and without more constitute negligence. But Kansas has never said that a high rate of speed in open country may not under certain conditions and circumstances constitute negligence. In every case in which the Kansas court has considered the question of high or even very high rate of speed in open country, it has indicated that peculiar conditions may impose liability because of such high rate of speed, even outside the city limits. * * * Here the

---

3. Chicago, Rock Island and Pac. R. Co. v. Hugh Breeding, Inc., 10 Cir., 232 F.2d 584, 588.

train was approaching a large city where highway traffic was bound to be heavy. 37th Street adjoined the City of Wichita on the north. It is doubtful if it can be said that this constituted open country. Visibility was almost zero. * * * Whether it was negligence on his part under such conditions to operate his train at the edge of the City of Wichita at 40 miles per hour is to say the least a question upon which reasonable minds might differ. We, therefore, think it was a question of fact for the jury and not for the court. * * * "

■ Ordinarily, what we decided in the former opinion would constitute the law of the case. However, the phrase "the law of the case" merely expresses the practice of courts generally to refuse to reopen what has been decided and is not a limitation on their powers.[4]

■ The rule will not ordinarily be applied where the evidence on the second trial was materially different from the evidence on which the prior decision was based.[5] And where, as in the instant case, the question decided was one of state law, with respect to which the Federal courts are bound to follow the decisions of the courts of the state, and where subsequent to the decision of the Federal court, the supreme court of the state has rendered a decision at variance with that of the Federal court, it is the duty of the Federal court that still has jurisdiction of the case to conform its decision and judgment to the latest decision of the supreme court of the state.[6]

The record in the instant case presents a substantially different factual situation from that stated in our former opinion. The crossing was located in open country and not in a thickly populated area. Traffic was not, in fact, heavy at the crossing and visibility, instead of being zero, was at least 1,000 feet from the engineer's position in the cab, as the train approached the crossing. Moreover, in a decision rendered subsequent to our decision in the former case, the Supreme Court of Kansas, in a case involving a collision between a transport truck and a train of the Railroad Company at the very highway crossing where the accident in the instant case occurred, held that it was not negligence to operate a railway train at such a speed that the engineer of the train could not stop the train within his range of vision of the crossing. See Johnson v. Killion, 179 Kan. 571, 297 P.2d 177, 179. In that case an action was brought against the operator of a motor fuel transport truck and his liability insurer to recover damages for the death of the engineer of the train, resulting from a collision at a grade crossing between the train and the truck. One of the defenses set up in the answer was:

"b. In operating his engine at such a speed when he knew or in the exercise of reasonable care should have known that it could not be stopped within his range of vision of the railroad crossing."

The trial court struck subparagraph b. In sustaining that decision the Supreme Court of Kansas in its opinion, in part, said:

" * * * the essence of appellants' position, * * * with respect to the allegations of such subparagraph is and of necessity must be that regardless of the speed in-

---

4. Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152; Page v. Arkansas Natural Gas Corporation, 8 Cir., 53 F.2d 27, 31.

5. Page v. Arkansas Natural Gas Corporation, 8 Cir., 53 F.2d 27, 31; Crotty v. Chicago G. W. Ry. Co., 8 Cir., 169 F.

593, 596; Balch v. Haas, 8 Cir., 73 F.2d 974, 977, 978.

6. St. Louis & S. F. R. Co. v. Quinette, 8 Cir., 251 F. 773, 775, 776; Pacific American Fisheries v. Hoof, 9 Cir., 291 F. 306, 309; Messinger v. Anderson, 225 U.S. 436, 443, 444, 32 S.Ct. 739, 56 L.Ed. 1152.

volved, an engineer who is operating a railway train at such a rate of speed it cannot be stopped within his range of vision of a railroad crossing is guilty of negligence. That, as will appear from a review of our decisions which we are not here disposed to labor or discuss, has never been the law of this state. * * * Therefore we hold that under the existing facts and circumstances the trial court did not err in sustaining appellee's motion to strike subparagraph (b) * * *."

Modlin v. Consumers Cooperative Ass'n, 172 Kan. 428, 241 P.2d 692, 697, was an action brought to recover damages for the wrongful death of an engineer of a Chicago, Rock Island and Pacific Railroad Company passenger train, which resulted from a collision at a railroad highway crossing between such train and a motor transport truck of the Consumers Cooperative Association. The Association's insurer was joined as a defendant. Each defendant in its answer alleged "that the deceased engineer's negligence in the operation of the train at a high and excessive rate of speed of at least 100 miles per hour, under conditions and circumstances which made it impossible for him to bring the train to a stop at the crossing when the occasion required, was the direct and proximate cause of his death." The trial court struck such defense from the answers. The view of the engineer as he approached the crossing was obstructed by a curve until he reached a point 1,900 feet from the crossing. In the opinion the court said:

"* * * The settled law of this state is that railroads may lawfully operate their trains at any rate of speed their business may require outside the limits of municipalities and populous communities where no peculiar conditions exist which make it dangerous for them to do so, even though the rate of speed is so great as to make it impossible for their trains to stop at crossings and that standing alone conduct of that character does not constitute actionable negligence." [7]

■ In that case we think the court clearly held that the fact the view of the crossing was so obstructed by the curve did not constitute a "peculiar condition," which made it dangerous to operate the train at a rate of speed which prevented the engineer from stopping the train within his view of the crossing. If a permanent condition, like that involved in the Modlin case, obstructing the engineer's view was not sufficient to bring the case within an exception to the general rule, then we think it must be equally true that obstruction of the engineer's view up to 1,000 feet from the crossing, because of weather conditions, would not constitute a peculiar existing condition, creating a dangerous situation that would take the case outside the general rule. Moreover, the Supreme Court of Kansas has dealt with a situation where a view of a crossing was obstructed because of weather conditions. In Bunton v. Atchison, T. & S. F. Ry. Co., 100 Kan. 165, 163 P. 801, 802, the court said:

"* * * But it could not be declared that any additional duty would rest on the defendant in the operation of its trains in the open country towards travelers at such crossings, on account of the mist, fog, or rain. We have not heard it suggested that the speed must be reduced and railroad trains kept under such control that they may be stopped before they reach a railroad crossing in the open country to prevent accidents in misty or foggy weather. Gage v. Atchison, T. & S. F. Railway Co., 91 Kan. 253, 137 P. 938, Ann.Cas.1915B, 410, and note. The trains must be operated

7. See also Atchison, T. & S. F. Ry. Co. v. Judah, 65 Kan. 474, 70 P. 346, 348;

Atchison, T. & S. F. R. Co. v. Hague, 54 Kan. 284, 38 P. 257, 259.

with dispatch. The public demands that service; and that this may be done, the duty to avoid getting run into at a railroad crossing in the open country is chiefly imposed upon the person who seeks to cross the railroad track—not out of regard for the railroad company, but because expedition of railroad operation is exacted by the public at the hands of the railroad company."

In Pennsylvania R. Co. v. Stegaman, 6 Cir., 22 F.2d 69, 71, the court said:

"* * * The impairing of visibility by fog or snow is a common condition. Highway crossings in the country very commonly come once a mile. If it were in the discretion of a jury to say that it is negligence to maintain regular and ordinary speed, within any reasonable limits, through the open country in a fog, it would be necessary, under such a condition, to abandon all time schedules. If such a restriction is reasonable and is in the public interest, it should be made by the Legislature. * * *"

■ We have shown that the travel at the crossing was not particularly heavy, but even if there had been considerable travel over the crossing, under the decisions of the Supreme Court of Kansas that fact would not have made speed an element of negligence.

In Land v. St. Louis & S. F. R. Co., 95 Kan. 441, 148 P. 612, 614, the court quoted with approval from Atchison, T. & S. F. Ry. Co. v. Judah, 65 Kan. 474, 70 P. 346, as follows:

"While there was considerable travel over this crossing, yet it was not in the corporate limits of a city, but in the country. It has been held by this court that in such cases speed cannot be made an element of negligence. * * *"[8]

A large amount of travel at a crossing does not become a material element,

unless it is such as to create confusion and render the noise of approaching trains indistinct and the ordinary signals difficult to be heard.[9] It is clear in the instant case that any inability to hear the noise of the approaching train or the ordinary signals was in nowise a contributing cause of the collision.

Accordingly, we conclude that the speed of the train, under the existing conditions, was not a fact upon which Breeding could predicate a claim of negligence on the part of the Railroad Company.

■ Nevertheless, we are of the opinion that the Railroad Company was not entitled to an instructed verdict in its favor on its cross-complaint. The engineer and other trainmen admitted that they saw O'Brien's signals and observed the truck on the crossing at a point opposite the gate and between 1,000 and 1,100 feet from the crossing. O'Brien testified that he saw no sparks flying from the wheels and heard no noise coming from the brakes that indicated their application, up to the time that he left the scene to go back to his office for the purpose of notifying the Railroad Company's superintendent.

Walker testified that if the brakes were working properly and the train was traveling 40 miles per hour, it could have been stopped within 695 feet and if traveling 50 miles per hour, it could have been stopped within 986 feet. It is true that Walker's testimony was predicated on a secret mathematical formula, which he refused to disclose to counsel for the Railroad Company, and as to the accuracy of which he had no personal knowledge; that there was no proof that the formula was a generally accepted standard formula, and that Walker did not take into consideration the reaction time for setting the brakes or the fact that a substantial portion of the train was traveling down grade. Nevertheless, there was no objection to

**8.** See also Atchison, T. & S. F. R. Co. v. Hague, 54 Kan. 284, 38 P. 257, 259.

**9.** Johnson v. Union Pac. R. Co., 157 Kan. 633, 143 P.2d 630, 634.

his testimony and no motion to strike it. We are, therefore, constrained to hold that there was some evidence that the engineer did not take immediate steps to apply the brakes and stop the train upon observing the signals and the truck stalled on the crossing, and some evidence that the engineer, by exercising reasonable care and prudence, might have avoided injury to the stalled truck after he had observed it on the crossing, notwithstanding the antecedent negligence of Breeding's driver, Gainer, and that the evidence with respect to those issues was sufficient to take the case to the jury.

## II.

### Breeding's Cross-Appeal.

■ The cross-appeal is predicated solely on the refusal of the court to direct a verdict in favor of Breeding on its complaint and the denial of Breeding's motion for a judgment non obstante veredicto.

We have concluded that the speed of the train, under the facts and circumstances, was not negligence. We have also concluded that there was no proof that the condition of the crossing was a contributing cause to the collision. While there was evidence that the east rail of the track was three-fourths of an inch to two inches above the planking, the undisputed evidence established that the drive wheels of the truck were stalled between the rails and had not reached the east rail, and there was no evidence that the slipping of the wheels was in anywise caused by the fact that the east rail projected above the planking.

Breeding's right to recovery must, therefore, be predicated either upon the negligent failure of the train crew to observe the warning signal or the doctrine of last clear chance. With respect to those issues, the evidence was in sharp conflict. Indeed, it weighed heavily in favor of the Railroad Company.

■ Moreover, there was evidence that the truck stalled because the rear wheels of the trailer went into the ditch near the guard rail as the result of Gainer's negligent operation of the truck. Under the evidence, there was also an issue of fact as to whether Gainer discharged his duty to avoid the collision by exercising ordinary care to warn the Railroad Company of the fact that the truck was stalled on the crossing. Gainer's duty in that respect continued up to the time that the train crew observed the truck on the crossing.

We conclude therefore, that there were issues of fact with respect to the Railroad Company's negligence and the contributory negligence of Gainer which required submission of the case to the jury. It follows that Breeding was not entitled to an instructed verdict or a judgment non obstante veredicto.

## III.

### Two Secondary Questions.

■ After the case was remanded on the former appeal, the Railroad Company filed a motion, supported by an affidavit, to transfer the case to the United States District Court for the District of Kansas for trial at Wichita, Kansas, under 28 U.S.C.A. § 1404(a). The affidavit averred that the testimony of nine persons who were residents of the City of Wichita, Kansas, would be material to the defense in the case; that five witnesses, whose testimony was essential to the defense and who were employees of the Railroad Company, resided at Herington, Kansas, a distance of 73 miles from Wichita and 246 miles from Oklahoma City, Oklahoma; that Gainer, the driver of the truck, was a resident of Tulsa, Oklahoma, and that the distance from Tulsa to Wichita was only 64 miles greater than the distance from Tulsa to Oklahoma City; that two important witnesses for the defense occupied the offices of Sheriff and Deputy Sheriff, respectively, of Sedgwick County, Kansas. The affidavit further set up the evidence to which each of the witnesses referred to above would testify

and showed that such evidence was material to the issues raised by the pleadings. The affidavit also averred that the accident occurred near the City of Wichita, Kansas, and that the principal office of Breeding was located at Tulsa, Oklahoma.

An earlier motion to transfer the case to the District of Kansas was made prior to the entry of the summary judgment. The trial judge denied that motion and his ruling was sustained by this court on the first appeal. But the second motion made a much stronger showing of grounds for transfer than did the first motion. We think it clearly appears from the second motion that the convenience of parties and witnesses and the interests of justice would have been served by transfer of the action to the United States District Court for the District of Kansas for trial at Wichita, Kansas. We are of the opinion that the trial judge abused his discretion in denying such motion. Should a like motion be interposed on remand of the case, it should be granted.

After the case had been submitted to the jury and they had deliberated for some time, they were returned to the courtroom and the court inquired how they stood numerically. The foreman answered that they were divided ten to two. Following that, the court gave certain supplementary instructions. The Railroad Company objected to the inquiry made by the court and has assigned it as error. Breeding did not object to the inquiry and has not assigned it as error. We are of the opinion that the inquiry, taken with the supplementary instructions, was calculated to wrongfully coerce the jury and that the inquiry should not have been made. See Berger v. United States, 10 Cir., 62 F.2d 438, 439, 440 and cases there cited.

The judgment against Breeding on its complaint is affirmed. The judgment against the Railroad Company is reversed and the cause remanded, with instructions to grant the Railroad Company a new trial.

